[L. A. No. 18816. In Bank. Mar. 21, 1944.]

RALPH P. GAGE, Petitioner, v. FRANK M. JORDAN, as Secretary of State, etc., et al., Respondents; RETIREMENT LIFE PAYMENTS ASSOCIATION, INC. (a Corporation) et al., Interveners.

O'Melveny & Myers, Louis W. Myers and Pierce Works for Petitioner.

Robert W. Kenny, Attorney General, Charles W. Johnson, Supervising Deputy Attorney General, Arthur McHenry, Deputy Attorney General, J. H. O'Connor, County Counsel (Los Angeles), and A. Curtis Smith, Deputy County Counsel, for Respondent.

Ellis E. Patterson, John J. Taheny, Jack B. Tenney, Paul F. Fratessa, Philip C. Boardman, J. Lamar Butler and Lawrence W. Allen for Interveners.

CARTER, J.—Petitioner, a qualified elector of Los Angeles County, applied to this court for a writ of mandate to compel the Secretary of State and the Registrar of Voters of Los Angeles County to omit from any ballot at any general or special election to be held in the future, the proposed initiative constitutional amendment known as the "Retirement Life Payment Amendment," and entitled by the attorney general, "Gross Income Tax, Warrant Credits." Petitioner also asked that the Secretary of State be compelled

to correct certificates of qualification transmitted by him in June, 1943, to the county clerk or registrar of voters of each county in the state by notifying those officials that the certificates should be disregarded, that the measure has never qualified, and that it must be omitted from any future ballot.

An alternative writ issued, in return to which the attorney general filed a demurrer and answer and the sponsors of the measure also intervened and answered. There is no dispute as to the facts. The issues joined present solely the problem of proper construction and application of article IV, section 1, of the Constitution of this state, particularly the provision of the second paragraph of said section which reads as follows:

"The first power reserved to the people shall be known as the initiative. Upon the *presentation* to the Secretary of State of a petition certified as herein provided to have been signed by qualified electors, equal in number to eight per cent of all the votes cast for all candidates for Governor *at the last preceding general election,* at which a Governor was elected, proposing a law or amendment to the Constitution, set forth in full in said petition, the Secretary of State shall submit the said proposed law or amendment to the Constitution to the electors *at the next succeeding general election occurring subsequent to 130 days after the presentation aforesaid of said petition,* or at any special election called by the Governor in his discretion prior to such general election. . . ." (Italics ours.)

The initiative measure here involved was first promulgated in 1940. On March 5th of that year the sponsors obtained from the attorney general a title and summary preparing the measure for submission to the voters as proposed article XXXII of the Constitution. Petitions for signatures were circulated in various counties and on May 29, 1940, the first certificates were received by the Secretary of State from county clerks. Supplemental certificates were received up to August 16, 1940, when a total of 196,498 signatures of qualified electors had been certified.

The "last preceding" general election for governor had been held in November, 1938, at which 2,651,463 votes were cast. As specified in the above quoted provision, 8 per cent of this number or 212,117 signatures were required to entitle an initiative measure to a place on the ballot "at the

next succeeding general election occurring subsequent to 130 days after the presentation aforesaid of said petition." The circulation of original, as distinguished from supplemental, petitions had been discontinued on June 28th, which was exactly 130 days prior to November 5, 1940, the date of the "next succeeding general election." Therefore, because of lack of sufficient signatures the measure did not qualify for a place on the ballot in November, 1940. A last minute attempt to certify enough additional signatures to qualify the measure was unsuccessful (*Thompson* v. *Kerr* (1940), 16 Cal.2d 130 [104 P.2d 1021]), and the certified signatures lay dormant in the office of the Secretary of State through all of 1941 and 1942.

At the general election in November, 1942, however, only 2,234,545 votes were cast for governor, 8 per cent of that number being 178,764. Hence if the qualification, certification, and presentation of signatures to the Secretary of State in 1940 did not become ineffective and void upon the failure of the measure to qualify for the 1940 ballot, there were by reason of the intervening 1942 election, enough signatures to qualify the measure for the 1944 ballot. Thus the question is directly presented of whether or not an initiative measure, having once failed to qualify for the ballot for want of enough signatures, is automatically revitalized by a sufficient decrease in the number of votes cast at a subsequent gubernatorial election to bring the number of signatures secured within the 8 per cent limit based upon the number of votes cast at said subsequent election.

In addition, it appears that in 1943, signatures were sought in Imperial County, where petitions had not previously been circulated, and that in May of that year thirty-nine qualified signatures from that county were certified to the Secretary of State. This made a grand total of 196,537 signatures. But without these additional signatures there had already been certified more than sufficient to qualify the measure for the 1944 ballot on the basis of 8 per cent of the votes cast in 1942, if that basis could properly be employed upon the theory that the time for "presentation" to the Secretary of State (see above quoted provision) had not lapsed upon the failure of the measure to qualify for the 1940 ballot. Thus the further question is also presented whether an initiative petition received by the Secretary of State and continuing

to be circulated is not to be regarded as finally "presented" to or "filed" by him until it has sufficient signatures to qualify for the ballot, regardless of how many years this may take. In this connection, paragraph 13 of section 1, *supra*, provides that "a petition shall be deemed to be filed with the Secretary of State upon the date of the receipt by him of a certificate or certificates showing said petition to be signed by the requisite number of electors of the State."

Preliminary to a discussion of these questions, it may be noted that the problem is one of first impression upon which no authority directly in point has been found in this or any other jurisdiction of the United States. It must therefore be solved by a proper and reasonable construction of the quoted provision, read *in pari materia* with the full context of the section and all other pertinent legislation. No similar situation will arise in the future because the Legislature in 1943 incorporated in the Elections Code a statute containing a time limitation provision (see Elec. Code, sec. 1407, Stats. 1943, p. 1127).

The desirability of having initiative measures, particularly those of such importance as the present one, reach the ballot without delay or excessive expenditures of time, money, and effort is a factor of which the courts are ever mindful. All doubt as to the construction of pertinent provisions is to be resolved in favor of the initiative and such legislation is to be given the same liberal construction as that afforded election statutes generally (*Ley* v. *Dominguez* (1931), 212 Cal. 587 [299 P. 713]; see, also, *California Teachers Assn.* v. *Collins* (1934), 1 Cal.2d 202 [34 P.2d 134]; *Willett* v. *Jordan* (1934), 1 Cal.2d 461 [35 P.2d 1025]; *Uhl* v. *Collins* (1932), 217 Cal. 1 [17 P.2d 99, 88 A.L.R. 1371]; *Hinkley* v. *Wells* (1922), 57 Cal.App. 206 [206 P. 1023]). However, the interpretation adopted must be reasonable and where the language is susceptible of more than one meaning, it is the duty of the courts to accept that intended by the framers of the legislation, so far as its intention can be ascertained. (*Pacific Indemnity Co.* v. *Industrial Acc. Com.* (1932), 215 Cal. 461, 464 [11 P.2d 1, 82 A.L.R. 1170]; *San Francisco* v. *Industrial Acc. Com.* (1920), 183 Cal. 273 [191 P. 26].) The purpose and object sought to be accomplished by the legislation are of prime importance in ascertaining that intention (*City and County of*

*San Francisco* v. *San Mateo County,* 17 Cal.2d 814 [112 P.2d 595]; *California Drive-in Restaurant Assn.* v. *Clark,* 22 Cal. 2d 287 [140 P.2d 657, 147 A.L.R. 1028]; *Estate of Ryan,* 21 Cal.2d 498-513 [133 P.2d 626]). ■ Furthermore, where the language is fairly susceptible of two constructions, one which, in application will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted. (*Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 648 [91 P.2d 577]; *Dept. of Motor Vehicles* v. *Industrial Acc. Com.,* 14 Cal.2d 189 [93 P.2d 131]; 23 Cal.Jur. 766.)

■ Under circumstances such as those here presented, mandamus is the proper remedy (*Felt* v. *Waughop,* 193 Cal. 498 [225 P. 862]; *Bordwell* v. *Williams,* 173 Cal. 283 [159 P. 869, Ann.Cas. 1918E 358, L.R.A. 1917A, 996]).

■ Article IV, section 1, of the Constitution, which was adopted in 1911, specifies in detail the manner in which the legislative power reserved to the People may be exercised by means of the initiative and the referendum. It sets forth a complete plan or scheme and when read in its entirety, together with statutes enacted pursuant to it, it clearly connotes an intention that insufficient petitions shall lapse and become *functus officio;* that is, it imports a time limitation running from the "last preceding general election" to the "next succeeding general election occurring subsequent to 130 days after the *presentation* aforesaid of said petition." The significance of the term "presentation" will be discussed later.

The steps in the initiative procedure are first, the entitling and summarization of the measure by the attorney general (sec. 1, *supra,* par. 8; Elec. Code, secs. 1401, 1452), and second, its circulation among the voters (sec. 1, *supra,* par. 9). The petition for signatures of electors may be circulated in sections, each section containing a full and correct copy of the title and text of the proposed measure (sec. 1, *supra,* par. 9). Each section may be filed with the clerk or registrar of voters of the county in which it was circulated, but all sections circulated in any county are to be filed at the same time (sec. 1, *supra,* par. 10).

There is, it is true, no prohibition against circulation of sections of petitions in any county indefinitely, and no spe-

cific time provision for completion of the entire process other than the period between general elections prescribed by the second paragraph of section 1, first herein quoted, or, more specifically, between a period commencing 130 days before a general election and 130 days before the second succeeding election. Obviously, with a then two-year period for registration, it was necessary that the petition be filed with the county clerk or registrar of voters within such a limited time as would enable him to determine whether the signers were qualified electors. The detailed provisions of section 1, providing an entire plan of procedure, impose meticulous time limitations for completion of various intermediate steps of the process, all of which would be utterly meaningless if petitions could be held over as valid indefinitely, or could be revitalized by any subsequent drop in the gubernatorial vote.

Consider the following provisions, which seem obviously to be directed at insuring that a measure, *if it qualifies,* shall go upon the ballot at the next succeeding general election occurring 130 days or more after the presentation to the Secretary of State of the initial certified petition, and that *if it does not qualify,* the entire procedure must be instituted anew:

1. The percentage of vote at the "last preceding general election" determines the qualification standard (sec. 1, par. 2, *supra*).

2. The proposed law must, if qualified for the ballot, be submitted "at the next succeeding general election occurring subsequent to 130 days after the presentation . . . of said petition" (sec. 1, par. 2, *supra*).

3. To insure completion of the process within this period, the measure must first be submitted to the attorney general for a title and summary. The submission must be made "prior to circulation of any initiative petition for signatures thereof," (see art. IV, sec. 1, par. 8), and the attorney general must provide a ballot title and return the measure to the Secretary of State within *10 days* after it is filed with him (Elec. Code, secs. 1401, 1452). Paragraph 8, *supra,* of section 1, also states that the persons presenting a measure to the attorney general with a written request for title and summary "shall be known as 'proponents' of said proposed measure," and that "The Attorney General shall preserve

said written request until after the next general election.''
Hence ''after the next general election,'' there is no longer
any title and summary, and without a title and summary
there can be no ''proponents'' and no ''measure.''

4. All sections circulated in a county must be filed with
the clerk at the same time, to the end that the signatures
may be checked within the short period of 20 days. As
stated in paragraph 10 of section 1, *supra*: ''Within *twenty
days* after the filing of such petition in his office the said
clerk or registrar of voters, shall determine from the records
of registration what number of qualified electors have signed
the same. . . .''

5. Additional help is provided; to wit: ''If necessary the
board of supervisors shall allow said clerk or registrar of
voters additional assistants for the purpose of examining
said petition and provide for their compensation.'' (Sec. 1,
*supra*, par. 10.)

6. The clerk or registrar ''upon completion'' of the exami-
nation is to ''forthwith transmit'' the petition, together with
his certificate to the Secretary of State. (Sec. 1, *supra*,
par. 10.)

7. The time within which the Secretary of State may act
is definitely limited. ''When the Secretary of State shall
have received'' the certified petition signed by the requisite
number of qualified electors, ''he shall *forthwith* transmit''
to the clerk or registrar his certificate showing that fact.
(Italics ours.) (Sec. 1, *supra*, par. 13.)

8. A limited period for filing supplemental petitions is
specified. ''Within *forty days* from the transmission'' of
the petition and certificate by the clerk to the Secretary of
State, a supplemental petition, identical with the original
but containing additional names, may be filed with the clerk
or registrar. (Italics ours.) (Sec. 1, *supra*, par. 10.)

9. *Ten days* are allowed the clerk to certify the result of
his examination of the supplemental petition to the Secretary
of State (sec. 1, par. 12, *supra*).

Hence in each respective county where petitions are cir-
culated, the process must be completed within 70 days from
the first filing of sections of any petition with the county
clerk or registrar, to wit: 20 days to check first sections, 40
days to secure supplemental names, and 10 days to check
supplemental names. At the expiration of this period it

becomes the ministerial function of the Secretary of State to *forthwith* certify the measure for the ballot if it has sufficient qualified signatures, measured by the last preceding gubernatorial vote (sec. 1, *supra,* pars. 2, 13).

In view of these express time limits and provisions for "forthwith" action, any construction of the second paragraph of section 1 which would destroy their effectiveness and render them meaningless would be clearly unreasonable and contrary to the intent of the framers of the legislation.

In addition to the evidence of intent supplied by the provisions above discussed, it may be worthy of note that paragraph 7 of section 1 affords protection to measures which have qualified but which, due to negligence or misprision, have not been placed on the ballot. It provides: "If for any reason any initiative . . . proposed by petition as herein provided, be not submitted *at the election specified in this section,* such failure shall not prevent its submission at a succeeding general election. . . ." (Italics ours.) This language affords support for the construction urged by petitioner here because it shows that only in the case of the stated exception may a measure go on the ballot at an election later than the *"succeeding* general election."

Contemporaneous construction placed upon section 1 by the Legislature of 1911, the same Legislature which drafted the constitutional provision, is also significant. Political Code, section 4058 (Stats. 1911, p. 577), in specifying the procedure for county initiatives, provided that if an initiative petition was found to be insufficient, it should be "returned to the person filing the same, without prejudice, however, to the filing of a *new* petition to the same effect." (Italics ours.) In incorporating this section in the Elections Code as section 1607, the Legislature of 1943 emphasized the point by providing that "the failure to secure sufficient signatures shall not prejudice the filing later of *an entirely new petition* to the same effect." A similar provision with reference to municipal initiatives was also enacted (Stats. Extra Sess., 1911, chap. 33, p. 131, sec. 1).

The most recent direct expression of the legislative intent is that already referred to, the enactment of new section 1407 of the Elections Code (Stats. 1943, p. 1127) providing that no petitions shall be circulated until after the official summary date and that first petitions with signatures

must then be filed with the county clerk or registrar "not later than *90 days* from the 'Official summary date' . . . and no clerk or registrar of voters shall accept first petitions on such proposed initiative measure thereafter." Is not this a clear recognition that the framers of the Constitution never intended that initiative measures should remain alive for year after year in the hope that they might ultimately qualify at some distant future election?

The detailed provisions of paragraphs 9 and 10 of section 1, prescribing the manner in which signatures are to be affixed and dated also fortify the conclusion that the life of the petitions is not to be unlimited. The manifest purpose of such provisions, as stated in *Chester* v. *Hall*, 55 Cal. App. 611 [204 P. 237], and approved in *Boggs* v. *Jordan*, 204 Cal. 207, 216 [267 P. 696], "is to guard against signatures by persons who are not qualified electors at the time of signing," thus making certain that no initiative measure shall appear upon the ballot unless it has been petitioned for by the requisite number of electors who are then qualified to vote upon the measure at the forthcoming election at which it is to be submitted. In other words, it is intended that the signers of the petition shall be qualified electors at the time of signing and that the measure shall be submitted at the *next* general election, at which they are qualified to vote. As electors change each year, through death, coming of age, removal, neglect to qualify, and the like, any construction of section 1, *supra,* which would permit the qualified electors of one year to determine largely the measures liable to go on the ballot in a subsequent year would lead to confusion and uncertainty, and would be contrary to public policy.

Illustrative of the impossible situation to which such a construction might lead, consider a measure first circulated prior to 1943, upon which signatures are allowed to cumulate year after year until the measure ultimately qualifies with reference to the last gubernatorial election preceding the last certification to the Secretary of State from any county in the state. Under this theory, as long as there remains one county out of the fifty-eight in the state in which a section of the petition has not been filed, the measure is eligible to qualify at some future gubernatorial election when the accumulative total of signatures of electors, past, present, living, dead, or removed from the state, shall equal the re-

quired 8 per cent of the vote cast at the then "last preceding election." Such a measure first proposed in 1912 might ultimately (allowing one filing in one county per year) qualify for the ballot *circa* A. D. 1970, or if there were one filing in one county every other year, it might qualify about A. D. 2028. That the constitutional provision could so operate was obviously never intended by the framers, and such a construction is too unreasonable to contemplate. Present day electors are not interested in initiating legislation to be finally adopted by their children or children's children.

The measure here under consideration was initiated with the intent that it should appear on the 1940 ballot. Since that year, there has been a drastic change in economic conditions, the nation has found itself in an exhaustive war, vast numbers of the people have surged to the western coast and many others have been removed by reason of war conditions. It may safely be assumed that many who signed as sponsors of the measure might refuse to sign were it submitted to them today, and the present electorate should not be burdened with their undertaking. The fact that it is not only reasonable, but desirable to limit the time for the qualification of initiative measure is commented upon as follows in the case of *State ex rel. Kiehl* v. *Howell,* 77 Wash. 651 [138 P. 286]:

"It, of course, is necessary that some practical test be provided for determining whether the signers of the petitions are legal voters. It is, of course, but fair that the petitions should, so far as practical, be signed only by those who would be voters at the election. This can be secured with greater certainty by having the petitions signed as near the time of the election as practical. We all know that our electorate is not the same from year to year. We are of the opinion that it is within the power of the Legislature to fix a reasonable limit of time preceding the election within which an initiative measure may be filed with the Secretary of State." See, also, *State ex rel. Ilg* v. *Myers,* 127 Ohio St. 171 [187 N.E. 301], where a somewhat similar problem was resolved in accord with the views here expressed.

Much of the argument in the briefs centers upon the meaning of the word "presentation" as used in section 1, and its asserted synonymy with the word "filing" as used in that section. The words in their usual and ordinary

sense are not generally defined as synonymous. For example, Webster's New International Dictionary, 2d ed., defines to "present" as, among other things, "to lay before, or submit to, a person or body for consideration or action; as to *present* a memorial, petition, or indictment," whereas to "file" is defined as: "(a) To deliver (a paper or instrument) to the proper officer so that it is received by him to be kept on file, or among the records of his office. (b) Of the receiving officer, to place (a paper or instrument) on file among the records of his office by receiving, endorsing, entering, or the like." In this state the distinction between the two expressions was early noted in the case of *Estate of Giovanni Sbarboro* (1883), 63 Cal. 5. To express the difference precisely it would be proper to say that ordinarily a document is "presented" to an official for "filing," but the filing is subsequent to rather than concurrent with the presentation.

In section 1 the word "presentation," or "presenting," or "presented" appears nine times, while the word "file" or "filing" or "filed" appears eleven times. Although the respective terms appear clearly to have been chosen with understanding of their exact meaning and to have been used with precise discrimination, yet it is argued that the "presentation" under paragraph 2 of section 1, first herein quoted, does not in fact occur until sufficient signatures have been certified to qualify the measure for the ballot; or, in other words, that the "presentation" is synonymous with the "filing" referred to in the provision of paragraph 13 of section 1, which states "a petition shall be deemed to be *filed* with the Secretary of State upon the date of the receipt by him of a certificate or certificates showing said petition to be signed by the requisite number of electors of the State."

Under this theory it is said that initiative petitions are neither presented nor filed until they are certified to have been signed by a sufficient number of qualified electors, and that this may occur either in the year that the initiative measure is first promulgated and sections from certain counties are presented, or in some later year. To state the process another way then, the time at which the requisite percentage of signatures is obtained, is to determine the time of "presentation" and also which election is the "last preceding general election," and which is the "next succeeding general election . . ." at which the measure must be submitted

to the voters. In the present case it is said that at no time prior to November, 1942, did the petitions bear sufficient signatures; therefore upon the certification in May, 1943, of thirty-nine signatures from Imperial county, it became the duty of the Secretary of State to consider the petition finally "presented" or "filed," under the signature computation based on returns from the *then* "last preceding general election," the election of 1942, and to certify the measure for the ballot in 1944.

The very statement of this complex proposition is indicative of its weakness. Section 1 clearly provides in express terms for "presentation" to the Secretary of State of a certified petition, which is to qualify the measure for the ballot at the next succeeding general election if sufficient signatures are obtained within the required time. It contemplates that all steps in the initiative proceeding, shall be taken not less than 130 days prior to the general election next following the institution of the proceeding, and that the sufficiency of the petition is to be tested by the last preceding gubernatorial vote. In view of the privilege given of circulating the petition in sections, and of filing supplements to it, it appears that the additional sections and supplements necessarily relate back to the "presentation" date of the first section presented. Thereafter, within the period, the petition is either "deemed to be filed" by reason of the certification of enough signatures, or else it lapses because of its failure to qualify for the subsequent election. This construction is not only reasonable, but it gives effect to *all* of the pertinent provisions of the section without straining the phraseology, and it appears to accord with the intent of the framers of the legislation. That the presentation precedes the filing of the petition is indicated by the provision in paragraph 9 of section 1 that: "Unless and until it be otherwise proven upon official investigation, it shall be presumed that the petition presented contains the signatures of the requisite number of qualified electors." This must refer to the required 8 per cent as there is no limit on the number of signatures to be obtained in any particular county and the Secretary of State is the official whose duty it is to determine the requisite number of qualified signers to authorize the filing of a petition.

Here the petition was "presented" in May, 1940; the "last

preceding general election'' was the election of 1938, hence the petition lapsed when it failed to qualify for the November, 1940 ballot.

Let a peremptory writ of mandate issue forthwith.

Gibson, C. J., Shenk, J., and Curtis, J., concurred.

SCHAUER, J.—I concur. Under the theory advocated by respondents and interveners, a group of persons, relatively small in the total population of the state, could settle in one county, register as electors, sign sections of the petition, file it in that county, then move on to another county, register there, sign and file new sections of the petition there, and repeat the process in as many counties of the state and over such a period of time as might be necessary to reach the goal of the number of qualified signatures equal to 8 per cent of the number of votes cast for governor at some election many years subsequent to the presentation of the first section of the petition.

Although the constitutional provision is unfortunately ambiguous, this court could not justify giving it a construction which would not only admit of, but would commit us to permit, such an absurd application of the law as that suggested above. Furthermore, to uphold respondents' and interveners' contentions that the constitutional provision contains no limitation upon the time within which petitions must be qualified would be tantamount to holding that the pertinent 1943 act of the Legislature (Elec. Code, sec. 1407; Stats. 1943, p. 1127) is unconstitutional.

TRAYNOR, J., Concurring.—The vital question in this proceeding is whether an initiative petition that fails for want of enough signatures to qualify the proposed measure for submission to the voters at the next general election after the receipt of the petition by the Secretary of State, remains effective indefinitely thereafter, enabling the proposed measure to qualify for the ballot on the basis of any general election for governor that succeeds the receipt of the petition by the Secretary of State. The answer to this question turns on the meaning of the second paragraph of section 1 of article IV of the California Constitution, which provides: ''Upon the presentation to the Secretary of State of a petition certified as herein provided to have been signed by quali-

fied electors, equal in number to eight per cent of all the votes cast for all candidates for Governor at the last preceding general election, at which a Governor was elected, proposing a law or amendment to the Constitution, set forth in full in said petition, the Secretary of State shall submit the said proposed law or amendment to the Constitution to the electors at the next succeeding general election occurring subsequent to 130 days after the presentation aforesaid of said petition, or at any special election called by the Governor in his discretion prior to such general election.''

This provision is ambiguous. It does not make clear what constitutes the presentation of the petition, for it speaks, not simply of the presentation of a petition, but of the presentation of a petition certified to have been signed by the requisite number of qualified electors. It cannot be determined whether such a petition has been presented without first ascertaining what is the last preceding general election, which is the basis for determining whether the 8 per cent requirement has been met. The last general election preceding the presentation of the petition, however, as well as ''the next succeeding general election occurring subsequent to 130 days after the presentation'' of the petition, cannot be ascertained without first determining what constitutes that presentation. The identification of either event depends upon the identification of the other under a literal construction of the second paragraph of section 1, and is therefore bound to be frustrated in this circle.

The attorney general, conceding that the paragraph in question is ambiguous, contends that the riddle is solved by the thirteenth paragraph of section 1 if the word ''filed'' therein is construed, as he contends it should be, to mean ''presented.'' That paragraph provides: ''A petition shall be deemed to be filed with the Secretary of State upon the date of the receipt by him of a certificate or certificates showing said petition to be signed by the requisite number of electors of the State.'' Even if it were assumed that the word ''filed'' in the foregoing provision is synonymous with the word ''presented,'' however, the last preceding general election as well as the presentation of the petition, would remain unidentified, for the petition would not be filed or presented until the Secretary of State received certificates showing the petition ''to be signed by the requisite number

of electors of the state." Since the Secretary of State would not know whether the petition was signed by "the requisite number of electors of the state" until he knew what "the last preceding general election" was, the attorney general's contention leads directly back to the second paragraph of section 1.

It is contended that since the petition may be presented in sections, the presentation of the petition is not a single act but a continuing process. Under this theory the receipt of the last certificate is as much a presentation of the petition as the receipt of the first, so that the last preceding general election may be regarded as the one preceding the receipt of the last certificate if all the certificates show that the petition has been signed by the requisite number of electors. There is no more reason, however, for selecting the date of receipt of the last certificate as the date of presentation than there would be for selecting the date of receipt of the first. Moreover, if all the certificates in the hands of the Secretary of State prior to 130 days before the next general election do not show that the petition has been signed by the requisite number of electors the receipt of neither the first certificate nor the last can fix the date of presentation.

The contention is then advanced that regardless of how many general elections occur after the certificates are first received by the Secretary of State, as soon as any general election occurs at which a governor is elected and at which the total number of votes cast for all candidates for governor is such that the total signatures shown by the certificates then in the hands of the Secretary of State equals at least 8 per cent of that total vote, the petition must be regarded as presented, and that election becomes the "last preceding general election." Under this theory the date of presentation would be a constantly shifting one that would not become fixed unless the number of signatures certified to be signed to the petition equalled at least 8 per cent of the votes cast at the most recent general election at which a governor was elected. The identification of one unknown, namely, the date of presentation, is thus arrived at by determining that the other unknown, namely, "the last preceding general election," is any general election after the initiation of the process that would qualify the measure. Under this interpretation the words "the last preceding general election at which

a governor was elected'' would become the most recent general election at which 8 per cent of the total number of votes cast for all candidates for governor equals or falls short of the number of signatures certified to have been signed to the petition. "The last preceding general election" could thus be any general election succeeding the institution of the initiative proceeding, depending upon the number of votes cast at the election and on the number of signatures certified to be signed to the petition. The words *"the* last *preceding* general election'' however indicate plainly that the framers of section 1 were referring to one particular election. The general election preceding the institution of the initiative proceeding seems more likely to be in accord with their intention than one of a number of general elections succeeding the institution of such proceeding. In any event, the attorney general's interpretation is certainly not compelled by the language of section 1. Since it would lead to the absurdities so graphically described in the majority opinion and thus violate the principle that constitutional provisions will not be interpreted to produce an unreasonable or absurd result, it must be rejected. (See 23 Cal.Jur. 722-3, 766-7.)

It remains for the court, therefore, in the light of section 1 as a whole, to identify "the last preceding general election," as well as the presentation of the petition, so that the section can operate in accord with the probable intention of its framers. A consideration of the instances in which there can be no doubt as to the operation of the section removes much of the confusion regarding its operation in a case like the present one.

If the Secretary of State receives a petition, prior to 130 days before the next general election, certified to be signed by electors equal in number to at least 8 per cent of all the votes cast for governor at the general election at which a governor was elected preceding the receipt of the petition, he must submit the proposed law or constitutional amendment to the electors at that next general election, or at any special election called by the governor before such general election. If he receives a petition that, prior to 130 days before the next general election, is not so certified, he cannot submit the proposed law or constitutional amendment to the voters at that next general election, or at any intervening special election. What happens to such a petition? Is it

revitalized by the receipt of additional certificates certifying that more signatures have been added to the petition? If the base election for determining whether the petition has the requisite number of signatures is the election preceding the receipt of the petition by the Secretary of State, it would be idle for the Secretary of State to receive additional certificates certifying that more signatures have been added to the petition, for it cannot be submitted at the next general election following the receipt by the Secretary of State of the petition. That election may already have been held. In any event the 130-day requirement cannot be met; for that reason the Secretary of State in 1940 refused to accept signatures from Tuolumne County certified to be signed to the very petition involved in this case, for they were received within less than 130 days before the election held on November 5, 1940.

It appears from the foregoing description of the procedure followed when a proposed measure clearly does or does not qualify for submission at a particular election, that the base election must be the election preceding the receipt of the petition by the Secretary of State, for otherwise he could never determine whether a petition had, within the time prescribed, the requisite number of signatures. He makes that determination in the only way that he can under the Constitution by ascertaining the total vote for all candidates for governor at the last general election at which a governor was elected preceding the receipt by him of the petition. If the petition were not regarded as presented to him, he could not proceed with his determination whether it had, within the prescribed time, the requisite number of signatures. Only by regarding the receipt by him of the petition as the presentation of the petition to him can he determine what is the next preceding general election, the basis of his determination whether the petition has been signed within the prescribed time by electors equal in number to at least 8 per cent of the total vote for all candidates for governor at that election.

Since the foregoing procedure is the one that the Secretary of State follows, and the only one that he can follow if he is to comply with the 8 per cent requirement and the 130-day limitation in passing upon initiative measures that clearly do or do not qualify for submission to the electors

at a particular general election, it must be regarded as the procedure that the framers of section 1 envisaged for all cases. This procedure conforms to the provisions of section 1. Thus it appears that the presentation of the petition may be made in sections (par. 9); that the presentation of each section consists of the transmission by a county clerk or registrar of a printed copy of the petition with his certificate showing the number of qualified signatures thereto that have been filed in his county (par. 10); that the presentation of the several sections may occur at different times, since each county clerk or registrar is required to transmit his section as soon as he completes his examination of the signatures (par. 10); that the Secretary of State has no duty to perform in this regard other than to receive the sections presented to him by the county clerks or registrars until the total number of signatures certified in the several sections is at least 8 per cent of all the votes cast for governor at the last general election at which a governor was elected preceding the presentation. If the signatures certified in the sections meet that requirement prior to 130 days before the next succeeding general election, the Secretary of State must submit the proposed measure at that election. It follows that a petition is presented to the Secretary of State upon the first date when one or more sections, containing "a full and correct copy of the title and text of the proposed measure" are received by him duly accompanied by a certificate from the county clerk or clerks transmitting the petition as to the number of signatures obtained in the particular county or counties. Thereafter the Secretary of State simply keeps count of additional signatures certified to be signed to the petition, to determine whether or not the measure qualifies for submission at the next general election occurring more than 130 days after the receipt of the petition. If it qualifies it goes on the ballot; if not, it does not go on the ballot and is thenceforth defunct. The Secretary of State is without authority to submit a measure at a subsequent election, that does not qualify for submission at the election succeeding the presentation of the petition, for the Constitution authorizes submission of the measure only at the next succeeding general election occurring subsequent to 130 days after the presentation of the petition or at any special election called by the Governor before such general election. If the

measure qualifies for submission to the electors at that next succeeding general election, however, but for any reason it is not submitted, then under the seventh paragraph of section 1, it may be submitted at a succeeding general election.

Since the proposed measure did not qualify under the prescribed procedure for submission to the electors at the election held on November 5, 1940, and since the Constitution does not authorize the Secretary of State to submit, at any subsequent election, a measure that fails to qualify for the next succeeding general election occurring after the presentation of the petition, the proposed measure cannot be submitted to the electors.

EDMONDS, J., Dissenting.—In 1911, by an amendment to the Constitution, the People of California declared that they "reserve to themselves the power to propose laws and amendments to the Constitution, and to adopt or reject the same at the polls independent of the Legislature, . . ." Election laws are to be liberally construed, and a proposed initiative measure should have a place upon the ballot unless, considering the fundamental purpose of the constitutional reservation of power, it may fairly be said that the requirements for such legislation have not been met. Indeed, courts should protect the right of the people to initiate and vote upon a measure which, in the opinion of some electors, would advance social or economic conditions, with the same regard for democratic principles as is demanded when the right of free speech is under consideration. Yet by the decision in the present case, notwithstanding the fact that the Constitution does not directly limit the time within which a petition to place a proposed measure on the ballot may be circulated, because of general provisions specifying the procedure to be followed in connection with the verification of voters' signatures by the county election officials, the People are denied the right to vote upon "The Retirement Life Payments Amendment." I cannot subscribe to such a narrow construction of the Constitution.

Certainly paragraph 2 of the constitutional provision is unfortunately worded. It declares: "Upon the presentation to the Secretary of State of a petition certified as herein provided to have been signed by qualified electors, equal in number to eight per cent of all the votes cast for all candidates for Governor at the last preceding general election,

at which a Governor was elected, proposing a law or amendment to the Constitution, set forth in full in said petition, the Secretary of State shall submit the said proposed law or amendment to the Constitution to the electors at the next succeeding general election occurring subsequent to 130 days after the presentation aforesaid of said petition, or at any special election called by the Governor in his discretion prior to such general election.'' (Const., art. IV, sec. 1.) The use of the word ''presentation'' in the quoted sentence gives rise to the principal difficulty in this case, for the Constitution also specifies: ''A petition shall be deemed to be filed with the Secretary of State upon the date of the receipt by him of a certificate or certificates showing said petition to be signed by the requisite number of electors of the State.'' But when all of the constitutional provisions are read together, it is clear that a petition, as distinguished from a section of a petition, is presented to the Secretary of State only when it bears a sufficient number of signatures to qualify the proposed measure for a place upon the ballot.

The constitutional provision specifying the procedure for the qualification and submission of an initiative or referendum measure uses the word ''presentation'' or ''presenting'' or ''presented'' nine times. The word ''file'' or ''filing'' or ''filed'' appears eleven times. The use of each of these words, when considered in connection with its context, shows a discriminating choice of language. For example: ''Any initiative or referendum petition may be presented in sections, but each section shall contain a full and correct copy of the title and text of the proposed measure.'' Certainly the word ''presented'' as here used is not synonymous with ''filed,'' for an initiative measure ''shall be deemed to be filed'' with the Secretary of State only when he has received a certificate or certificates signed by the requisite number of electors.

Other sentences also show that the Constitution's draftsman clearly understood the meaning of the words he selected. The sponsors of an initiative measure are defined as the persons ''presenting'' a request to the attorney general for the preparation of a title and summary of it. By another provision the persons who shall ''prepare and present'' arguments for and against each measure shall be selected by the presiding officer of the Senate. In a subsequent paragraph relating to the rights of proponents, there is a restriction con-

cerning any section or supplement "presented for filing." A use of the word in the same manner appears in the requirement as to the printing of the title, "Initiative measure to be presented to the Legislature." Here are instances of a precise use of the word "present" in its customary and usual meaning, which is: "To lay before, or submit to, a person or body for consideration or action; as to present a memorial, petition or indictment." (Webster's New International Dictionary, 2d ed.) But the filing of a paper or document connotes the finality of official action which follows presentation.

Applying these definitions to the constitutional provisions, it clearly appears that the "presentation" to the Secretary of State of a petition certified as having been signed by the required number of qualified electors is not a single act. "Any initiative . . . petition may be presented in sections," the Constitution reads. Each county clerk or registrar of voters must examine the signatures upon each section of a petition filed with him. As soon as he completes such examination, he shall "forthwith" attach his certificate to a copy of the petition, except the signatures, "and shall forthwith transmit said petition, together with his said certificate" to the Secretary of State. Obviously, in practice, these documents will be received at different times, and, of necessity, the "presentation" to the Secretary of State of a petition by sections can only be made by the delivery to him, through a county clerk or registrar of voters, of a copy of the petition with a certificate made by the local election officer that it has been signed by a stated number of electors, qualified to do so. Other than to receive the sections, the Secretary of State has no duty to perform unless and until the aggregate of the number of signers certified in the several sections amounts "to eight per cent of all the votes cast for all candidates for Governor at the last preceding general election at which a Governor was elected." If and when the number of signatures as certified to him total that amount, the petition "shall be deemed to be filed" and he shall "submit the said proposed law or amendment to the Constitution to the electors. . . ."

Under this construction, there is no time limit within which the qualification of an initiative petition must be completed. Sections of the petition may be circulated indefi-

nitely in any county. But upon the filing of a section or sections with a county clerk or registrar of voters, all further action in that county must be completed within seventy days. There is no prohibition, however, against circulation of the petition in any other county, and signatures may be obtained until the aggregate of them, as certified by the local election officials, reaches the required number.

Admittedly with no limitation of time for the qualification of a proposed measure except the requirements as to circulation in a particular county, a law or constitutional amendment might be submitted to electors many years after the petition for its enactment was signed by some of them. But a court may not place restrictions upon the procedure for direct legislation which are not found either in the Constitution or in any statute enacted to facilitate its operation. Certainly section 45 of the Elections Code, which is relied upon by counsel for Gage, makes no requirement as to the time when an initiative measure must be placed upon the ballot. Based upon section 1083a of the Political Code, a predecessor statute, it declares that only one who is a registered qualified elector may sign an initiative petition, and that he must also write the date of signing and his place of residence. In *Chester* v. *Hall*, 55 Cal.App. 611 [204 P. 237], the Political Code section was upheld as legislation which facilitates the operation of the constitutional plan and places safeguards around the exercise of the right to have a proposed law or constitutional amendment voted on by the people. (See, also, *Boggs* v. *Jordan*, 204 Cal. 207, 214 [267 P. 696].) But the statute cannot reasonably be construed as a requirement either that each signer of an initiative petition be a qualified elector both at the time of affixing his signature and on the date of the election at which the proposition is submitted to a vote, or as a restriction upon the time within which such a petition may be presented to the Secretary of State.

As another ground for the issuance of a writ of mandate in this proceeding, it is insisted that the gubernatorial election which fixes the number of signatures required for a petition is the one which immediately precedes every step in the initiative procedure including presentation. In support of that construction, reference is made to provisions of the Constitution and of the Elections Code with relation

to the preparation of a title and summary for any proposed measure.

Section 1452 of the Elections Code allows any one interested in direct legislation, "at any time prior to one hundred thirty days before the election at which the measure is to be voted upon," to request a ballot title for it. As construed by counsel for Gage, this means that the request must be made prior to 130 days before the next general election. But the language cannot be so limited. By the express terms of the statute, the election at which the proposed measure is to be voted upon need not necessarily be the next one after the request for a title is made, and the proponents of the constitutional amendment which is the subject of the present proceeding, more than 130 days before the date of any election to be held in the year 1943, complied with the requirement regarding entitlement.

The constitutional mandate directing the attorney general to preserve the written request for a title and summary "until after the next general election" (art. IV, sec. 1, par. 8), also relied upon by counsel for Gage, is more to the point. From this language it is argued that the initiative process must be commenced and completed between two consecutive general elections. Certainly the direction to the attorney general affords some basis for believing that the draftsman of the Constitution intended that the record of the request for entitlement be kept only until the electors had voted upon the measure, and that this would occur at "the next general election." But such a conclusion is largely surmise, and in construing constitutional provisions concerning a matter so important to the public interest as the legislative power reserved to the people, a limitation of time may not be implied where none is expressed. Both constitutional and statutory provisions relating to direct legislation should be liberally construed with a purpose to protect the reserved right of the citizen. (*Uhl* v. *Collins,* 217 Cal. 1 [17 P.2d 99, 88 A.L.R. 1371]; *Ley* v. *Dominguez,* 212 Cal. 587 [299 P. 713].)

And as I read the opinion in *State ex rel. Ilg* v. *Myers,* 127 Ohio St. 171 [187 N.E. 301], the decision supports the position of the Secretary of State in the present case. Under the Ohio Constitution, the court held, the "preceding election" to be used as a base for computing the qualification of

an initiative petition "is clearly the election immediately preceding the filing of the petition." The record showed that the date of filing was one day prior to the gubernatorial election of 1932. Subsequent to that election the Secretary of State ascertained that, based upon the vote cast for Governor in 1930, which was the election for Governor next preceding the filing of the petition, there were insufficient signatures to qualify the measure. Thereafter additional signatures were procured and filed. Upon the basis of the vote cast at the election of 1930, the petition then had the necessary number to qualify the proposal. According to the election of 1932, it still lacked the number fixed by the Constitution as requiring submission to the electors. The court decided that the election of 1930 governed.

Apparently in Ohio, although a petition is circulated for signature in separate parts, all of the parts are filed with the Secretary of State who ascertains the number of signatures which are valid. The date upon which the petition was filed, said the court, determined the "preceding election" which must be used as a base in determining its qualification although another gubernatorial election had intervened during the time allowed for securing additional signatures. Using the date of filing as the decisive factor in the present proceeding, "the last preceding general election at which a Governor was elected" is the one of 1942.

To me, the action of the Legislature of 1911 fortifies this conclusion, for the statutes enacted at that time, as I read them, show a purpose to place a limitation upon the circulation and qualification of a county and a city initiative measure which does not apply to one to be submitted to the electors of the entire state. In that year, section 4058 of the Political Code was enacted. It made provision for the submission to the electors of a county of either an initiative or a referendum measure, and declared that any petition for that purpose which was found insufficient should be returned to "the person filing the same, without prejudice, however, to the filing of a new petition to the same effect." Other legislation related to the procedure for initiative and referendum measures in cities and towns and also directed that any petition found insufficient should be returned to its proponent. (Stats. 1911, p. 359.) Subsequently, by action at the extra session of 1911, the Legislature declared that in lieu of re-

turning an insufficient petition, it should remain on file as a public record. (Stats. Ex. Sess. 1911, p. 125 as to county measures; p. 131 as to city or town proposals.)

Certainly the legislative action shows an awareness that the Constitution does not limit the time for the circulation and qualification of a proposed initiative measure and a determination that there should be a restricted period during which a petition may be signed by electors and submitted to a vote in a county, a city or a town. The enactment of 1943 also indicates legislative cognizance that the Constitution does not set any particular period for the circulation of an initiative petition (other than that relating to the examination of signatures by local election officials), and the qualification of the proposal. Article IV, section 1, of the Constitution is self-executing, "but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved." In connection with the declaration of the Constitution, it may be noted that this court, in accordance with what it declared to be the uniform rule, has upheld the power of the Legislature "to enact statutes providing for reasonable regulation and control of rights granted under the constitutional provisions." (*Chesney* v. *Byram,* 15 Cal.2d 460, 465 [101 P.2d 1106].) Other cases to the same effect include *First M. E. Church* v. *Los Angeles County,* 204 Cal. 201 [267 P. 703], and *Chester* v. *Hall, supra.*

For these reasons and, in particular, giving effect to the cardinal rule of construction that every intendment of the constitutional provisions and of statutes enacted to facilitate their operation is in favor of the qualification of an initiative measure, I believe that the electors of the state are entitled to vote upon "The Retirement Life Payments Amendment."

Interveners' petition for a rehearing was denied April 17, 1944. Edmonds, J., voted for a rehearing.