[Civ. No. 28140. Second Dist., Div. Four. Apr. 30, 1964.]

BENJAMIN M. LAWING, Petitioner, v. HARRY A. FAULL, as Mayor, etc., et al., Respondents.

Harry R. Roberts and James H. Piatt for Petitioner.

Robert C. Gustaveson, City Attorney (Pomona), and Patrick J. Sampson, Deputy City Attorney, for Respondents.

Nossaman, Thompson, Waters & Moss, Franklin T. Hamilton, Richard J. Riordan and Joseph A. Carbone as Amici Curiae on behalf of Respondents.

BURKE, P. J.—A petition for writ of mandate was brought by petitioner, a taxpayer and elector of the City of Pomona, to compel the city clerk to certify the sufficiency of a referendum petition directed to an ordinance of the city council rezoning a 26-acre parcel in the city, and to compel the city council to call an election thereon.

Within 30 days after adoption of the ordinance, a referendum petition was filed with the city clerk, who, in due course, certified that it was signed by 4,913 registered voters of the city. On the date of filing the petition, there were 27,653 registered voters within the city; at the last preceding general municipal election, the total number of registered voters was 26,565. In other words, the petition was signed by more than 10 per cent, but by less than 20 per cent, of the registered voters on either date. The clerk certified that the petition was insufficient because it failed to comply with the signature requirement of section 143 of the city charter. The city council thereupon refused to call a referendum election. The present proceeding followed. We issued our order to show cause why a writ of mandate should not issue compelling the council to call an election as requested. After argument and consideration, we conclude that the writ should be denied.

Section 143 of the Charter of the City of Pomona (Stats. 1911, part 2, pp. 1951-1952) provides in part: "If during said thirty days [after adoption of an ordinance] a petition signed by qualified electors of the city equal in number to at least twenty per cent of the total number of registered voters at the last preceding general municipal election, protesting against the passage of such ordinance, be presented to the

council, the same shall thereupon be suspended from going into operation and it shall be the duty of the council to reconsider such ordinance; and if the same be not entirely repealed, the council shall submit the ordinance as is provided in article XXI of this charter, to the vote of the electors of the city, . . ."

Petitioner contends that the foregoing provision of the charter imposes more onerous restrictions upon the exercise of the right of referendum than those prescribed by the Constitution of the state and must therefore be subordinated to the latter provisions.

By an amendment to the Constitution adopted October 10, 1911, the right of initiative and referendum was reserved to the people of the state both with respect to state and local government legislation. (Art. IV, § 1.) With respect to local governments, the section reads in part as follows: "The initiative and referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the State to be exercised under such procedure as may be provided by law. Until otherwise provided by law, the legislative body of any such county, city and county, city or town may provide for the manner of exercising the initiative and referendum powers herein reserved to such counties, cities and counties, cities and towns, but shall not require more than 15 percent of the electors thereof to propose any initiative measure nor more than 10 percent of the electors thereof to order the referendum. Nothing contained in this section shall be construed as affecting or limiting the present or future powers of cities or cities and counties having charters adopted under the provisions of section 8 of article XI of this Constitution. In the submission to the electors of any measure under this section, all officers shall be guided by the general laws of this State, except as is herein otherwise provided. This section is self-executing, but legislation may be enacted to facilitate its operation, but in no way limiting or restricting either the provisions of this section or the powers herein reserved."

The section was designed to apply to all classes of counties and cities, including so-called general law cities and those whose electors have seen fit to enjoy a greater measure of home rule as to municipal affairs by enacting charters, with the approval of the Legislature, under section 8 of article XI.

With these two types of cities in mind, we return to a reading of the above quoted portions of section 1 of article

IV and note that, unlike the provisions relating to the exercise by the people of the state of initiative and referendum powers, with respect to which the constitutional amendment proposed detailed regulations, it was contemplated that the regulations for the exercise of such powers by the people of counties and cities, would be "provided by law." With respect to chartered cities, the last mentioned phrase would include the enactment of such regulations by a charter provision or by legislation enacted by the duly constituted legislative body of the city. A charter provision concerning such matters is clothed with all the dignity of a statutory enactment of the state Legislature. (*Taylor* v. *Cole*, 201 Cal. 327, 333 [257 P. 40].) However, with respect to cities governed by the general laws, such matters are regulated by statute and in article IV, section 1, it was provided that, until such statutory enactment, the local legislative body might provide for the manner of exercising the powers of initiative and referendum but subject to the limitations that they should not require more than 15 per cent of the electors to propose any initiative measure, nor more than 10 per cent of the electors to order the referendum.

The use of the phrase "Until otherwise provided by law" must be accorded its plain intendment that until (1) the Legislature acted, as to nonchartered cities governed by the general laws in such matters, or (2) as to chartered cities enjoying home rule powers in respect to municipal affairs (art. XI, §§ 6, 8) until the people of such a city had acted by a charter provision, or, (3) as to such a chartered city, until the legislative body thereof had acted by local ordinance, the limitations imposed in the particular sentence relating to 15 per cent and 10 per cent should prevail. Certainly nothing in this particular sentence either requires or infers that such restrictions as to chartered cities enjoying home rule powers (art. XI, §§ 6, 8) should continue beyond the point where it would be "otherwise provided by law."

Under sections 6 and 8 of article XI of the Constitution, cities may be empowered in their charters "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters. ..." By the provisions of its charter Pomona in 1911 brought itself within the condition of the "municipal affairs" sections of article XI. The city has thereby acquired "the power of 'municipal home rule' with respect to all matters of local or internal

concern." (*Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303, 310 [144 P.2d 4]; *City of Pasadena* v. *Paine,* 126 Cal.App.2d 93, 98 [271 P.2d 577].) Therefore, with respect to matters that are "municipal affairs," the city enjoys autonomous rule and is not subject to general laws concerning such affairs. (*Brougher* v. *Board of Public Works,* 205 Cal. 426, 437 [271 P. 487].)

Even prior to the enactment of article IV, section 1, in 1911, provisions in city charters relating to city initiative and referendum regulations were held by the courts to be proper in legislating on municipal affairs and not violative of either state or federal Constitutions. (*In re Pfahler,* 150 Cal. 71 [88 P. 270, 11 Ann. Cas. 911, 11 L.R.A.N.S. 1092].)

▪ With this background in mind, it is clear that the language of section 1 of article IV that "Nothing contained in this section shall be construed as affecting or limiting the present or future powers of cities . . . having charters adopted under the provisions of section 8 of article XI of this Constitution" must be interpreted as a declaration of intention that such powers, long enjoyed by the electors of many home rule cities, be not deemed to have been curtailed by the constitutional amendment. ▪ The section concludes with a statement that it is self-executing but providing that legislation may be enacted to facilitate its operation "but in no way limiting or restricting either the provisions of this section or the powers herein reserved." The effect of this last mentioned restriction is to preclude either the State Legislature, the people of a city through a charter amendment, or the legislative body of any city, from withholding or nullifying the initiative and referendum powers reserved by the Constitution. Such limitation, however, may not be extended to include the provisions with respect to the percentage of voters required to propose any initiative measure or to order a referendum, since with respect to such matters the particular language dealing with them expressly contemplates that they may be changed by law ("Until otherwise provided by law. . ."). ▪ It is conceivable, of course, that a legislative body of a home rule city could, by ordinance, require such a high percentage of voters to sign a petition, for either of such purposes, as to make the use of the referendum or initiative so onerous and burdensome as to constitute a denial of the use thereof to the electors of such city and thereby violate the constitutional reservation of such powers. In determining whether a particular provision is unduly bur-

densome it must be considered as it applies in the particular city.

Local conditions vary from city to city with respect to population and other factors, and in taking judicial notice of the provisions of various city charters, as set forth in the statutes, it will be seen that the percentages of electors required to sign such petitions vary and that in some very large cities the percentages required are substantially below the 15 and 10 per cent figures contained in the interim provision in section 1 of article IV.[1]

It is noteworthy that in many fields of legislation local home rule has given way to the desirability of uniform state laws because of ever-increasing population and urbanization and the need for statewide uniformity in such areas as control of traffic, education, public health and public offenses. But with respect to the local exercise of the initiative and referendum we are dealing solely with matters on local legislation, and who best can determine what will provide most effectively a fine balance between the legislative powers delegated to the elected representatives of a city, on the one hand, and initiative and referendum powers reserved to the people of such city, on the other? Certainly, it is the people of the particular cities involved who are familiar with local conditions who are best able to regulate such matters either by means of charter provisions, which in their enactment require a majority vote of the electorate and concurrence by the Legislature, or by ordinance of their duly constituted legislative bodies acting within the limits prescribed in such charters.

Percentages with respect to initiative and referendum applied to a city with a population of under 5,000 might be entirely prohibitive with respect to a city of a million people. The cost of circulating such petitions in the largest cities would nullify the use of the initiative and referendum if heavy percentages were required. In a very small city the electorate might consider that a reasonably high percentage is necessary in order that a small but active group of obstructionists might not unduly hamper the elected officials of the city from carrying on their proper legislative functions. By repeated use of the referendum such a group could foist on the entire community one costly and futile election after another. This is why, undoubtedly, in the framing of the

[1]Los Angeles, 5 per cent, Statutes 1925, page 1024; Sacramento (500 signatures), Statutes 1921, page 1919.

constitutional amendment, it was made clear that it was not intended to affect or limit the present or future powers of such home rule cities, or of the Legislature itself with respect to general law cities to adopt appropriate legislation prescribing the manner of exercise of these reserved powers.

With respect to general law cities, the Legislature did enact a comprehensive procedural scheme immediately following the passage of the constitutional amendment (see Elec. Code, § 4000 et seq.), and as to such cities the courts have held that the state has occupied the field. (*In re Lane*, 58 Cal.2d 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897].) The Legislature, however, recognized the constitutional reservation of powers in such matters to home rule cities by expressly providing (Elec. Code, § 4057) that such regulations do not apply to any such cities having in their charters any provision for the "direct initiation of ordinances by the voters."

Petitioners assert that charter provisions dealing with reserved powers are always liberally construed in favor of the power. (*Truman* v. *Royer*, 189 Cal.App.2d 240, 244 [11 Cal.Rptr. 159].) However, a liberal construction does not mean enlargement of the plain provisions respecting the reserved power. (*Mulville* v. *City of San Diego*, 183 Cal. 734, 739 [192 P. 702]; *MacLeod* v. *City of Los Altos*, 182 Cal. App.2d 364, 369 [6 Cal.Rptr. 326].)

Petitioner states that "with the exception" of *Newport Beach Fire & Police Protective League* v. *City Council* (1961) 189 Cal.App.2d 17 [10 Cal.Rptr. 919], commented on later, there are no cases involving possible conflicts between charters and the referendum provisions of section 1 of article IV of the Constitution, and petitioner places his reliance very heavily upon this case as authority for the proposition that, since the signature requirements for a referendum petition as set forth in the Pomona charter conflict with the provisions of section 1 of article IV of the Constitution, the charter provision must yield to the Constitution. Petitioner points out that, with the exception of the above case, the cases construing possible charter-constitutional conflicts have in the main dealt with *the nature or character of the subject matter* of a proposed measure and not with *the manner or method* of exercising the direct legislative power. For example, the early Supreme Court case of *Hopping* v. *Council of City of Richmond*, 170 Cal. 605 [150 P. 977], dealt with the question of whether the referendum powers reserved to the

electors of a city were applicable to a resolution of the city council as distinguished from an ordinance. In construing the relationship of the constitutional provisions to the provisions of the Richmond City Charter, the court declared (pp. 610-611) : ''The declaration of the constitution that its provisions do not affect or limit the referendum power reserved to the people of any city by its charter, does not limit the constitutional reservation nor enlarge those reserved by such charter. The two reservations are thereby made independent of each other. The constitutional reservation goes to the full extent expressed by its language. If the charter differs from the constitution in any respect it does not thereby diminish the power reserved by the constitution. On the other hand, if the powers reserved by the charter exceed those reserved in the constitution the effect of the charter would be to give to the people the additional powers there described. (*Long* v. *Portland,* 53 Ore. 92 [98 P. 149, 1111].)''

The court held that there was no significance to be attached to the use of the word ''ordinance'' in the charter and that the referendum powers clearly reserved by both the Constitution and the charter would extend to legislative enactments by the city council whether they be by resolution or ordinance.

*Brown* v. *Boyd,* 33 Cal.App.2d 416, 419 [91 P.2d 926], construed the charter provisions of the City and County of San Francisco and noted that that charter, adopted in 1931, did not provide for the exercise by the people of the constitutionally reserved right of referendum (except as to ordinances granting franchises). It was held this constituted a direct attempt to curtail the powers reserved to the people of cities by the Constitution, and in following the language of *Hopping, supra,* the court declared that such powers were not subject to abridgment by the Legislature or by the people of the city. The court noted that when a city has availed itself of the privilege of being independent of general law in respect to its municipal affairs in a charter adopted under sections 6 and 8 of article XI of the Constitution it is nevertheless subject to other limitations provided in the Constitution and that therefore the constitutional reservation of the power of referendum has to be read into and becomes a part of every city charter with the same effect as though it had been expressly incorporated in the charter.

Similarly, in *Hunt* v. *Mayor & Council of City of Riverside,* 31 Cal.2d 619, 623 [191 P.2d 426], the court reiterated

the rules established in *Hopping,* and followed in *Brown* v. *Boyd, supra,* stating, ''In other words, as between the provisions of the Constitution and the provisions of a city charter, those which reserve the greater or more extensive referendum power in the people will govern.'' The court noted, however, that acts providing for tax levies are expressly excepted from the operation of the referendum provisions of the Constitution, and after a detailed analysis of the charter provisions relating to the exercise of the referendum it concluded that such charter provisions likewise excluded such an ordinance from the referendum.

In *Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744 [8 Cal.Rptr. 427, 356 P.2d 171], the charter provisions of the City of Hayward came under scrutiny of the court. There the court had before it a home rule charter which provided that ordinances of the city would take effect immediately upon the date of adoption unless the effective date is otherwise stated therein and the crucial question was whether such a provision could thwart the referendum powers reserved to the people. The court declared (p. 756) : ''It is well settled that while a chartered city may, under the home rule provisions of article XI, section 8, of the Constitution determine *its own method* for the referendum of city ordinances it cannot prevent the operation of an effective referendum procedure. [Citing *Hopping, supra,* and *Brown* v. *Boyd, supra.*] Thus may be assumed that this rezoning ordinance never became 'effective' in the sense that it was subject to a referendum.'' (Italics added.)

Since its enactment in 1872 it has been a maxim of jurisprudence that ''contemporaneous exposition is in general the best'' basis for interpretation. (Civ. Code, § 3535.) This rule of contemporaneous construction has also found support in court decisions. (*Reuter* v. *Board of Supervisors,* 220 Cal. 314 [30 P.2d 417] ; *Railroad Comrs.* v. *Market St. Ry. Co.,* 132 Cal. 677 [64 P. 1065]. Similarly, see *Gage* v. *Jordan,* 23 Cal.2d 794 [147 P.2d 387], and *Rutledge* v. *Dominguez,* 122 Cal.App. 680, 685 [10 P.2d 1027].)

It is highly significant that contemporaneous and subsequent enactments of both charter and statutory provisions regulating the referendum demonstrate that the percentage signature provisions contained in section 1 of article IV of the Constitution were not intended as a maximum signature requirement for city referendum petitions. The same 1911 Legislature which proposed the initiative and referendum

provisions of the Constitution approved 11 charters or charter amendments (including the charter of the City of Pomona) and adopted two statutes relating to local initiative and referendum measures, none of which had signature requirements identical with the constitutional provisions.

In the brief of amicus curiae filed in support of respondents each of these charter provisions is related and the varying percentages of registered voters are stated. Their requirements for signers vary from 5 to 25 per cent of the electorate and are based in some instances upon (1) total votes for all candidates for the election of mayor at the last election, (2) the entire vote cast at the last municipal election, (3) all registered electors of the city, or (4) the total votes for governor at the last election within the city. The larger cities tended to reduce the percentages of signatures below those provided for in the Constitution and some of the smaller cities to substantially increase those percentages. For reasons heretofore indicated, this is entirely proper and constituted an attempt on the part of the people of those cities to provide for procedures which would fairly preserve the intended purpose of the Constitution. Similarly, provisions for the exercise of the initiative and recall by the electorate adopted by the 1911 Legislature indicated wide variances.

In *Bakersfield & Kern Elec. Ry. Co.* v. *Hay,* 29 Cal.App. 289 [155 P. 132], in the construction of the home rule charter of the City of Bakersfield, the question was whether the unqualified words ''general election'' used in the charter related to the last general municipal election or the last general state election. The court construed the reference to be to the last general municipal election. Of significance here, however, is that the provisions of the charter under consideration required petitions for referendum to be signed by electors of the city equal in number to 25 per cent of the entire vote cast at the last general election. The petitioners had pointed out that the general law governing the exercise of initiative and referendum by cities required referendum petitions to be signed by qualified electors equal to 10 per cent of the entire vote cast for all candidates for governor at the last preceding general election. The court said (pp. 292-293) : ''We have no evidence that the referendum provisions of the charter were drawn from those of the statute to which counsel refer; and even if they were so derived, the failure to copy words distinctly defining the last preceding general election as a state election serves to indicate that the charter

framers preferred that the protest against the adoption of an ordinance should be signed by at least twenty-five per cent of the number of electors voting at the last general municipal election, rather than that the test should be ten per cent of the entire vote cast at a state election." In *Bakersfield, supra,* the court had before it the difference between the percentages of electors required under the interim provision of the Constitution (which had been repeated in the statute governing nonchartered cities) and those of the charter and decided that the charter provisions should prevail.

This brings us to consideration of the *Newport Beach* case, *supra,* which, as indicated, petitioner declares is the only one that deals with a city charter having a provision attempting "to expressly limit the reserved power guaranteed by the Constitution. . . ." First, it should be noted that the case is in no way directly in point with the case before us since it dealt with a special type of so-called "referendum" unknown to the Constitution which has been termed by the Attorney General as "voluntary referendum." It is referred to in section 4019 of the Elections Code and authorizes a city council in its own discretion, and without any referendum petition whatever, to refer a proposed ordinance to the voters for approval or disapproval.

Section 1003 of the Newport Beach Charter (Stats. 1955, p. 3636) relating to initiative and referendum incorporates by reference the Elections Code provisions pertaining to the holding of such elections. In an obvious effort to preserve the civil service rights of employees of the city which they had acquired under previous ordinances of the city, the new charter of the city, adopted January 7, 1955, contained provisions retaining such civil service system in full force. In addition, the new charter (§ 803) provided that no departments or appointive officers or employees should be withdrawn from such system either by an outright repeal of the civil service ordinance, or otherwise, unless such withdrawal is approved by the electors of the city "by a majority of two-thirds of those electors voting on the proposition." On November 4, 1958, the repeal of the earlier civil service ordinance and the adoption of a new ordinance were submitted to the electors by the city council by so-called "voluntary referendum." It was adopted by a majority vote of the electors but not by a two-thirds vote thereof. Opponents contended that, having fallen short of the two-thirds requirement of the charter the ordinance was inoperative. Proponents contended

that the ordinance did not involve a withdrawal of any employee from the civil service system since it only substituted a new civil service ordinance for the earlier one and therefore the charter provision requiring a two-thirds vote did not apply; secondly, that if it applied, such charter provision violated the provisions of the state Constitution which reserved to the electorate the right to legislate by majority action. The case did not deal with the percentage of signatures required on either an initiative or referendum petition and is not applicable to the proceeding before this court.

In *Newport, supra,* the court ruled that the so-called initiative action did not have the effect of withdrawing officers or employees from the protection of civil service, and consequently that the charter provision under scrutiny was inapplicable. Having so decided, any other holdings were unnecessary to the decision and are not controlling here. The court, however, further held that, insofar as the charter provision in question purported to limit the initiative power vested in the people it was unconstitutional and therefore ineffective, relying primarily on *Hopping, supra,* and *Brown v. Boyd, supra.* The court stated (189 Cal.App.2d 17, at p. 23): "As heretofore noted, by constitutional provision the people of the state at large may adopt an initiative measure by a majority vote. A charter provision requiring a two-thirds vote is a limitation upon the constitutionally reserved power. To permit a city charter to regulate the extent to which voter approval is essential to the adoption of an initiative measure would be to permit control tantamount to authority to withdraw from the people a power reserved to them by the Constitution. It is our opinion that the adoption of an initiative measure by a majority of the voters is an integral part of the constitutionally reserved power to act through the initiative; that any regulation requiring a greater number of votes to adopt an initiative ordinance is a limitation upon that power; and that a charter provision requiring a two-thirds vote is ineffective."

It will be seen, therefore, that these provisions of the decision relate to an attempt to curtail the right of the electorate in voting upon an initiative or referendum measure and do not deal with the percentage of voters required to initiate legislation or to subject it to the referendum.

█ By clear and unambiguous language the 10 per cent requirement of section 1 of article IV of the Constitution was made applicable only to interim regulations of legislative

bodies, as the city councils and boards of supervisors, pending state legislation, and was clearly intended to apply to those counties and cities which are subject to the general laws of the state and to those chartered cities or counties which had no provisions whatever in their charters for the exercise of these reserved powers. By equally unambiguous language it provided that the constitutional provision should not be construed as limiting the powers of home rule cities having charters adopted under section 8 of article XI of the Constitution. The historical text of the 1911 constitutional amendments and legislative interpretations placed thereon by the 1911 and subsequent Legislatures, contemporaneous and subsequent court decisions interpreting the constitutional provisions, and subsequently enacted charter provisions, make it clear that the constitutional amendment provisions were not intended to restrict chartered cities, with home rule powers in municipal affairs, as to the manner and method of exercising the initiative or referendum power reserved to the people by the Constitution.

The order to show cause is discharged; the petition for a writ of mandate is denied.

Jefferson, J., and Kingsley, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied June 24, 1964.