[S. F. No. 17775. In Bank. Aug. 3, 1948.]

ARTHUR JAMES McFADDEN, Petitioner, v. FRANK M. JORDAN, as Secretary of State, etc., Respondent; WILLIS ALLEN et al., Interveners.

Landels & Weigel, Stanley A. Weigel, Edward D. Landels, Tobriner & Lazarus, Mathew O. Tobriner and Samuel D. Thurman, Jr., for Petitioner.

Fred N. Howser, Attorney General, J. Francis O'Shea, Assistant Attorney General, and Leonard M. Friedman, Deputy Attorney General, for Respondent.

Lawrence W. Allen, Paul F. Fratessa, William S. Sparks, Kenny & Cohn, Robert W. Kenny, Morris E. Cohn, A. Brooks Berlin and Max Radin for Interveners.

SCHAUER, J.—Petitioner asks that this court by writ of mandate direct respondent Secretary of State of California not to submit to the electors, at the general election to be held on November 2, 1948, a "purported initiative amendment" to the state Constitution and "not to certify it to the Registrars of Voters and County Clerks in the State, and . . . to desist from any act in aid of the submission of said purported initiative amendment to the electors." Since the issuance of the alternative writ the proponents of the measure, as intervenors, have filed, as in the nature of a return, a general demurrer, motion to strike, and an answer to the petition, and the attorney general, on behalf of respondent, has filed, by way of a return, a demurrer and answer. As will appear from the text which follows, the issues raised by the answers and by the motion to strike are immaterial in relation to the ground of our decision, and, hence, are not discussed in detail. From an examination of the proposed measure, itself, considered in relation to the terms of our Constitution as now cast, we find it clear beyond question that, as urged by petitioner, the proposed initiative enactment amounts substantially to an attempted revision, rather than amendment, of our state Constitution; and that inasmuch as the Constitution specifies (art. XVIII, § 2) that it may be revised by means of a constitutional convention but does not

provide for revision by initiative measure, the writ must be granted.

The right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter. As said in *Gage v. Jordan* (1944), 23 Cal.2d 794, 799 [147 P.2d 387], "All doubt as to the construction of pertinent provisions is to be resolved in favor of the initiative and such legislation is to be given the same liberal construction as that afforded election statutes generally [citations]. However, the interpretation adopted must be reasonable and . . . it is the duty of the courts to accept that intended by the framers of the legislation, so far as its intention can be ascertained." The conclusion we have reached—that the proposed measure is revisory rather than amendatory in nature and that as such it is barred from the initiative upon any legally permissible construction of the pertinent constitutional provisions—is overwhelmingly impelled by the far reaching and multifarious substance of the measure itself and by the terms of the present constitutional provisions relative to the initiative and to amendment and revision of the Constitution, which provisions are not only clear in themselves but have heretofore in controlling aspects been the subject of scrutiny and exposition by this court.

The only method provided in the Constitution by which it can be revised is set forth in section 2 of article XVIII. That section requires (1) a vote of two-thirds of the Legislature to recommend that the electors vote "for or against a convention for the purpose"; (2) a vote in favor of such a convention, by a majority of the electors voting; (3) the calling of such a convention and the election by the people of delegates thereto; (4) the adoption by the convention of a proposed constitution; (5) ratification by the people of such constitution.

In *Livermore* v. *Waite* (1894), 102 Cal. 113, 117-119 [36 P. 424, 25 L.R.A. 312], this court declared, "Article XVIII of the constitution provides two methods by which changes may be effected in that instrument, one by a convention of delegates chosen by the people for the express purpose of revising the entire instrument, and the other through the adoption by the people of propositions for specific amendments that have been previously submitted to it by two-thirds of the members of each branch of the legislature. [The provision for amendment by initiative was added in 1911, art. IV, § 1.]

It can be neither revised nor amended except in the manner prescribed by itself, and the power which it has conferred upon the legislature in reference to proposed amendments, as well as to calling a convention, must be strictly pursued. Under the first of these methods the entire sovereignty of the people is represented in the convention. The character and extent of a constitution that may be framed by that body is freed from any limitations other than those contained in the constitution of the United States. If, upon its submission to the people, it is adopted, it becomes the measure of authority for all the departments of government, the organic law of the state, to which every citizen must yield an acquiescent obedience. . . . The legislature is not authorized to assume the function of a constitutional convention, and propose for adoption by the people a revision of the entire constitution under the form of an amendment . . . The constitution itself has been framed by delegates chosen by the people for that express purpose, and has been afterwards ratified by a vote of the people, at a special election held for that purpose, and the provision in article XVIII that it can be revised only in the same manner, and after the people have had an opportunity to express their will in reference thereto, precludes the idea that it was the intention of the people, by the provision for amendments authorized in the first section of this article, to afford the means of effecting the same result which in the next section has been guarded with so much care and precision. The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed.'' (See also 5 Cal.Jur. § 11, pp. 559-560; 16 C.J.S. § 7, pp. 30-31; 11 Am.Jur. § 25, p. 629.)

The initiative power reserved by the people by amendment to the Constitution in 1911 (art. IV, § 1) applies only to the proposing and the adopting or rejecting of ''laws and amendments to the Constitution'' and does not purport to extend to a constitutional revision. That amendment was framed and adopted long after the decision in *Livermore* v. *Waite*

334

(1894), *supra*, 102 Cal. 113. By well established law it is to be understood to have been drafted in the light of the Livermore decision. (See 50 Am.Jur. §§ 321, 322, pp. 312, 313.) As said in *Estate of Moffitt* (1908), 153 Cal. 359, 361 [95 P. 653, 1025, 20 L.R.A.N.S. 207], "[A] familiar and fundamental rule for the interpretation of a legislative statute is that it is presumed to have been enacted in the light of such existing judicial decisions as have a direct bearing upon it." (See also, to the same effect, *In re Halcomb* (1942), 21 Cal. 2d 126, 129 [130 P.2d 384], and cases there cited.) It is thus clear that a revision of the Constitution may be accomplished only through ratification by the people of a revised constitution proposed by a convention called for that purpose as outlined hereinabove. Consequently if the scope of the proposed initiative measure (hereinafter termed "the measure") now before us is so broad that if such measure became law a substantial revision of our present state Constitution would be effected, then the measure may not properly be submitted to the electorate until and unless it is first agreed upon by a constitutional convention, and the writ sought by petitioner should issue. (See *Livermore* v. *Waite* (1894), *supra*, 102 Cal. 113.) Mandamus is a proper remedy. (*Gage* v. *Jordan* (1944), *supra*, 23 Cal.2d 794, 800, and cases there cited.)

 The measure proposes to add to our present Constitution "a new Article to be numbered Article XXXII thereof" and to consist of 12 separate sections (actually in the nature of separate articles) divided into some 208 subsections (actually in the nature of sections) set forth in more than 21,000 words. The Constitution as now cast, with the amendments added since its original adoption as revised in 1879, contains 25 articles divided into some 347 sections expressed in approximately 55,000 words. The provisions of the proposed measure may be summarized as follows:

Section I of the measure is entitled "PRINCIPLES AND POLICY" and is divided into nine subsections. It states that "This article may be cited as the 'California Bill of Rights.'" It also contains declarations of various ethical, economic and governmental concepts and philosophies.

Section II is entitled "THE CALIFORNIA PENSION COMMISSION" and is divided into 18 subsections. It provides for the creation of a California Pension Commission of five members with terms of six years. The names and addresses of the per-

sons who are to be the "first five commissioners" are explicitly set forth. Subsequent commissioners are to be elected and to be subject to recall. Commissioners are specifically declared to be "eligible for re-election." Each commissioner is to receive a salary of $15,000 a year, plus travel expenses. Provision is made for appointment of a secretary to the commission and he is given certain duties and powers. The commission is authorized to appoint and to dismiss at pleasure other employes, and to establish offices; and it is directed to create and "continuously maintain, a pension and disability fund" which is to be used for the sole purpose of "pension payments, disability payments, salary or other payments that are, by this article, directed to be paid by the commission." The "books and accounts of the commission" are to be audited "without prior notice, four times each year" by a "person or state department" to be named by the governor.

Section III of the measure is entitled "RETIREMENT PENSION PAYMENTS" and contains 30 subsections. It directs that the pension commission shall from time to time fix a retirement age so that "of those citizens whose age is greater than the age so fixed, sufficient numbers may choose to qualify for pension payments, by retiring from the pursuit of gain, to the end that not more than five per cent of those persons over age 18 and below the pension age shall be involuntarily without gainful employment." Citizens over the pension or retirement age are to be group "A"; those who are 18 or more years of age and who are disabled and "permanently disqualified for normal gainful employment" are to be group "B"; widows with children under 18 are to be group "C"; all other citizens 18 years of age or over are to be group "D." The commission is to pay to each person in the first three groups who has resided in this state for the immediately preceding 10 years and who promises not to be employed for remuneration "in the production of goods or services for sale or for hire," a pension of not less than $100 a month through June, 1952, and of not less than $130 a month thereafter. Group "D" citizens are to be paid by the commission not less than $30 a week during temporary disability "for normal employment." If prices increase, the commission is to increase pension and disability payments proportionately. No part of any pension or disability payment is to be used "to support an able-bodied person in idleness except a recipient's spouse." The payments are to be exempt from attachment. Employment for gain dis-

qualifies a pension recipient, but other income does not. The measure is not to "be construed to repeal or abrogate the provisions of" the present "old age security law of the welfare and institutions code"; it makes no specific declaration as to whether it is intended that the provisions for payments to persons "permanently disqualified for normal gainful employment" and those who are suffering temporary disability "for normal employment" shall affect the workmen's compensation "complete system" authorized by section 21, article ·XX, of the Constitution. Indians residing in this state are to receive the pension and disability payments and "shall be, entitled to qualify as electors of this state under the same conditions as other citizens." Ministers and other persons engaged solely in religious or charitable work "who shall have no other gainful occupation" are to receive the same pension as group "A" persons, as also are teachers who have "served not less than 25 years in . . . accredited schools in this state." On the death of a pension recipient funeral expense of $200 is to be paid to the mortuary of his choice. Each year any surplus in the pension fund may, if the commission wishes, be transferred into the "general fund of the state treasury"; deficits in the pension fund are to be made up out of the state's general fund. However, if a deficit exists "prior to the general election to be held in 1950 or prior to subsequent general elections," then the commission is "to place on the ballot, at the next succeeding general election, a proposed amendment to this article which shall either provide the additional funds" to meet all payments required of the commission "without appropriations from the general fund, without assessing new taxes and without increasing the general taxes or the general tax rates, or else which shall provide for the issuance, by the state, of negotiable, self-liquidating, noninterest bearing bonds in sufficient amounts" to make up the deficit.

Section IV of the measure contains 50 subsections and is entitled "WAGERING AND GAMING." It gives to the pension commission jurisdiction to license for operation in this state and to supervise various types of gaming, wagering and lotteries, including horse racing. The licensees are to pay to the commission as "pension money" to be placed in the pension and disability fund, certain specified fees and also specified percentages of the receipts of the licensed operations.

Section V of the measure is entitled "TAXES" and contains 16 subsections. It levies against "each person, firm, co-part-

nership or corporation residing or doing business in this state, except as otherwise provided by this article, a uniform tax, which shall consist of $2 of each $100 of the gross sums of money or values received by them in the course of business, trade, the practice of any profession, service or employment''; it appears that such language contemplates that the tax shall be collected on interstate and foreign as well as intrastate transactions.* Except as provided in the measure, such tax is to ''be the only tax, license fee, or other fee that shall be levied or collected by the state, or by any political subdivision of the state, or by any county, city and county, city, or district,'' and no other tax ''or license fee'' is to be ''levied against any home, or other real estate, or personal property or business enterprise'' in the state. The gross receipts tax, sometimes in the proposed measure termed a gross income tax, is to be administered and collected by the state board of equalization and is not to be used for pension and disability payments unless the fund provided for such payments ''shall be temporarily insufficient.'' The tax is to be paid monthly to the respective county tax collectors and by them transferred to the state treasurer, and the ''gift income'' of charitable, religious, and certain other organizations is exempted. Penalties are imposed for nonpayment by taxpayers and for fraudulent returns. The proceeds of the tax are to be applied, first, to the support of ''the public school system and the state university.'' The use to be made of the balance, if any, of the tax monies is not made clear, although it may be supposed that the budgets of the state and of its political subdivisions, insofar as they are not limited by other provisions of the measure hereinafter noticed, are intended to be met therefrom. Provision is made for the preparation of such budgets and for public scrutiny thereof, and it is declared that ''No tax budget for the state or for any political subdivision of the state shall be for a sum greater than the corresponding budget for the year 1947,'' except upon a majority vote of the electorate.

Section VI is entitled ''OLEOMARGARINE,'' and contains only one subsection. It provides that oleomargarine, whether colored or not, may be sold and served in this state without a license and without the payment of a tax or fee.

Section VII, entitled ''PERTAINING TO THE HEALING ARTS,''

---

*Such state levy upon receipts from interstate and foreign transactions, it is asserted on behalf of petitioner, is void as in contravention of the United States Constitution. For reasons hereinafter stated we do not reach this question.

is set out in 53 subsections. It first creates the "California State Board of Naturopathic Examiners" and then states that "Except that all of the forms and branches of the healing arts or sciences that were entitled to be licensed under the law as it stood at the last day of December 1947 shall continue to be . . . under the jurisdiction and supervision of the issuing board, the jurisdiction and supervision over all persons having to do with teaching, practicing, conducting, applying or carrying on for hire, any form or branch, or any philosophy or technique of the healing arts, sciences, treatments, practices, applications, appliances and devices as now evolved or that may be evolved including preparations for, the making of, and the fitting of podoprosthetics, othontoprosthetics, other prosthetic or mechanical restorations, replacements or devices intended as replacements, restorations or as health aids or supplements to the healing arts is vested in the state board of naturopathic examiners; provided except; any form of license issued by any other licensing board for the teaching, practicing or carrying on of any form or branch of the healing arts or sciences may likewise be issued by the state board of naturopathic examiners, and all licenses shall be under the sole jurisdiction and supervision of the issuing board." The board is to consist of "five examiners whose terms of office shall be five years" and whose compensation is provided, and the names and addresses of the persons who are to be the "first five examiners" are specifically listed. Subsequent examiners must hold the degree of "Doctor of Naturopathy" and are to be elected to the board by certain of the board's licensees. "Each examiner shall be eligible for re-election." The attorney general is to be the board's legal adviser. The board is given broad power to supervise, regulate and discipline its licensees, and to employ and to dismiss at pleasure such "persons as may be necessary." Licensees and applicants for a license are to pay certain specified fees to the board. Fees and other money received by the board are to be used only for purposes authorized by the board. The board may also "determine what shall constitute an approved course of primary education and training, an approved college of naturopathy, or an approved course of study in any form or branch of the healing arts contemplated by this section." A naturopathic hospital or sanitarium may operate only with board approval. Licensees holding "major" or "special major" licenses from the board are to "have and be accorded at all times and in all circumstances the same and

every right, prerogative and privilege accorded to physicians and/or surgeons licensed otherwise than by the board." The section provides, finally, that "No absence of a pupil from school for the purpose of having dental services rendered or for the purpose of receiving health treatments under the direction of any physician, doctor or practitioner of any recognized form of healing shall, by any educational or school authority, be deemed an absence in computing average daily attendance."

Section VIII is entitled "CIVIC CENTERS" and contains five subsections. It declares that "There is a civic center at each and every public school building and grounds within the state," and grants to "Every non-profit, non-sectarian organization, club or association of electors of the state, formed for political, economic, educational, or moral activities," the right, "without the payment of any charge or fee," to use any "public school civic center" as a place of assembly and free discussion.*

Section IX contains three subsections and is entitled "LEGISLATURE, ELECTIONS, COMMITTEES." Subsection (1) provides for a reapportionment of the senate of this state. Subsection (2) prohibits cross filing at primary elections, provides that the Legislature shall enact certain laws concerning primary elections, and specifically repeals present section 2½ of article II of the state Constitution. Subsection (3) has to do with the choosing of committees of the Legislature.

Section X is entitled "FISH, GAME, PUBLIC LANDS AND WATERS," and contains five subsections. It sets out certain regulations of public lands and inland waters of the state, and bestows various powers and duties upon the Fish and Game Commission.

Section XI, entitled, "SURFACE MINING," is divided into nine subsections. It provides for the regulation of certain types of surface mining in this state, for the issuance of permits to operate, and for penalties for violation of the regulations.

---

*One of the attacks made upon the measure, which we have found unnecessary to discuss as a separate ground, is the claim that its self-styled title "California Bill of Rights," printed in large type on the initiative petitions, is misleading and in effect, a fraud upon the electorate, because of the widely heterogeneous subjects encompassed by the measure. It is to be noted that only this section (§ VIII) and section X, hereinafter summarized, do appear to relate to matters touched upon in the present constitutional "Declaration of Rights" as set forth in article I.

Section XII completes the measure, is entitled "GENERAL," and contains nine subsections. Subsection (1) provides that the "state printer shall engrave, lithograph or print all printing" required under the measure, except that the pension commission may do its own printing, etc. Subsection (2) provides for submission to the electorate of any "proposed amendment to this article, prepared by" the pension commission. Subsection (3) permits the reimbursement of a "volunteer worker in a political campaign" for expenses incurred; the source of reimbursement is not stated. Subsection (4) provides that "No injunction or writ of mandate, or other legal equitable process, shall ever issue or be maintained to interfere with the effectiveness or operation of this article, or to prevent or enjoin any provision of this article from going into effect or to prevent or seek to prevent the California Pension Commission from submitting to the electorate proposed amendments to this article in the manner herein set forth." Subsection (5) declares that "This article is self-executing," and prohibits the Legislature from adopting any "legislation which, in even the slightest degree, limits or restricts" the provisions "of this article" or "purporting to facilitate" its operation. Subsection (6) provides that "in the event that in any action or proceeding . . . before any court of competent jurisdiction in the state . . ., there occurs, or is rendered, any decision or order which adversely, or at all, either affects this article or the administration thereof or affects the submission, by the pension commission, of any proposed amendment to this article, such decision or order shall have no effect until it shall have been" approved by the majority vote of the electorate. Subsection (7) repeals any portion of the present Constitution which "is in conflict with any of the provisions of this article." Subsection (8) defines various words used in the measure. Subsection (9) consists of severability clauses.

As previously mentioned the Constitution as now cast contains 25 articles divided into 347 sections. It is apparent that in mechanical composition the sections of the proposed measure correspond to articles of the Constitution and subsections of the measure to sections of the Constitution. Comparison of the provisions of the measure with those of our present Constitution indicates that the measure will, or under conceivable circumstances may, affect at least the following articles and sections of, and will add at least the following new subjects to, the present Constitution, all as respectively indicated:

1. Article I of our present Constitution is entitled "Dec-

laration of Rights." Inasmuch as the measure (§ I) declares that "This article may be cited as 'California Bill of Rights' " a misleading and confusing conflict in terminology of titles and related subject matter appears at the outset.

2. To what extent, if any, the present Declaration of Rights might be affected by the proposed blanket repeal of any portion of the present Constitution which "is in conflict with any of the provisions of" the new measure we do not now undertake to determine. Section 25 of article I, however, which has to do with public fishing rights in state public lands and waters, would appear to be at least enlarged upon by section X of the measure, which also treats of "Fish, Game, Public Lands and Waters"; section VIII of the measure also relates to, although it may not substantially alter, the rights declared in sections 9 (Liberty of Speech and of the Press) and 10 (Right to Assemble and to Petition) of article I.

3. Article II of the Constitution, which treats of the right of suffrage, is affected in at least two respects:

A. By the provision of section III of the measure that Indians "shall be entitled to qualify as electors."

B. By those provisions of section IX of the measure which regulate primary elections and expressly repeal section 2½ of article II.

4. Article III, which declares the distribution of the powers of government of this state into three separate departments —the legislative, the executive, and the judicial—will be affected in that the provisions of subsections (4) and (6) of section XII of the measure would limit judicial powers as they might "at all . . . affect" the article or the "administration thereof" by the commissioners; such commissioners are given executive power (see Const., art. V, § 6, also §§ 7, 8) to fill vacancies on their own board "for the unexpired term" (subsec. (6) of § II); and the commission is given legislative power (see Const., art. XVIII, § 1; art. IV, § 1) to prepare "Any proposed amendment to this article" and "Any proposed amendment to this article, prepared by the California Pension Commission shall be submitted, by the Secretary of State, to the people at the first general election occurring subsequent to 130 days after an official announcement by said commission of the necessity for such amendments." In view of the broadly heterogeneous subjects covered by the article the scope of the proposed "amendments" which the commission could prepare and put to a vote appears almost, if not entirely,

unlimited; and "volunteer workers" in behalf of such measures (or the election or reelection of commissioners, examiners, or apparently, any candidate approved by the commissioners for any political office) could be reimbursed for their expenses. (§ XII, subsec. (3).)

5. Article IV of the Constitution deals with the state's legislative department. At least the following of its provisions will be affected, if not in some instances totally repealed, by the measure:

A. The initiative provisions of sections 1 and 1b of article IV, by the provisions of the measure (§§ III, XII) vesting in the pension commission the power to propose and require a vote upon amendments to the measure, which proposed amendments, as above indicated, could apparently cover an almost, if not entirely, unlimited scope in the field of government.

B. The budget and claims provisions of sections 1a and 34 of article IV, by the budget provisions of section V of the measure and by the provisions of section II, subsections (12) to (17) inclusive, giving the commission exclusive powers as to the handling and expenditure of funds.

C. The senate apportionment provisions of section 6 of article IV, by the apportionment provisions of section IX of the measure.

D. The provisions of sections 20 and 21 of article IV to the effect that certain federal officers and also persons convicted of certain crimes shall not hold offices of profit under this state, by the provisions of sections II and VII naming the particular persons who are to be the original members of the pension commission and of the "Board of Naturopathic Examiners," respectively, regardless of whether at any time concerned any of them might be disqualified by any of the provisions of sections 20 and 21 of article IV of the Constitution, and by providing specifically in such sections II and VII, respectively, that "Commissioners" and "Each examiner" "shall be eligible for re-election."

E. The fiscal provisions of the two sections numbered 22 of article IV, and of sections 29, 34, and 34a of the same article, by the fiscal powers given in the measure to the pension commission (§ II) and the "Board of Naturopathic Examiners" (§ VII).

F. The provisions of section 25a of article IV, dealing with horse racing and betting, by provisions of section IV of the measure treating of the same subject.

G. The provisions of sections 25½ and 25⅝ of article IV which have to do with the Fish and Game Commission, by provisions of section X of the measure dealing with the same commission.

H. The lottery and bucketing provisions of article IV, section 26, by the wagering and gaming provisions of section IV of the measure.

I. The provisions of section 30 of article IV prohibiting public aid for sectarian purposes, by the provisions of section III of the measure which specifically grant pensions to ministers and other persons engaged in religious or charitable work "who shall have no other gainful occupation."

J. Provisions for the payment of retirement pensions, regardless of need therefor, to persons who have reached an age set by the proposed pension commission, and to other persons not presently the recipients of direct financial support from the taxpayers, would substantially affect, and at least partially repeal, the proscription against the gift of public funds contained in section 31 of article IV, as well as affect section 22 of the same article.

K. Section 37 of article IV, having to do with legislative committees, by provisions of subsection (3) of section IX of the measure, concerning the same committees.

6. Article V of the Constitution treats of the executive department of this state. Sections II and VII of the measure would create a commission and a board which would be charged with carrying out and administering the provisions of the measure completely independent of control by the governor. The same sections would also relate to his powers of appointment in case of vacancies in a public office, conferred by section 8 of article V. Section VII of the measure would add to the duties of the attorney general as set forth in section 21 of article V, that of legal adviser to the "Board of Naturopathic Examiners."

7. Article VI of our present Constitution deals with the state's judicial department. As noted hereinabove, the provisions of subsections (4) and (6) of section XII of the measure, would limit materially the functions of the courts of this state and would effect a substantial change in balance of governmental power.

8. Article IX of the Constitution deals with education. Its provisions would be affected by the measure in at least the following respects:

A. By the provisions of section VII of the measure, changing the method of computing average daily attendance at public schools, and consequently the apportionment of school funds. (See art. IX, § 6.)

B. By the provisions of section V of the measure, entitled "Taxes," which in effect repeal the provisions of sections 6 and 6½ of article IX, having to do with school taxes and bonds.

C. By the provisions of section III of the measure, which grant pensions to school teachers.

D. By the provisions of section VIII of the measure, establishing civic centers at public school buildings, and granting rights to use such buildings.

9. Article XI of the Constitution has to do with the government of cities, counties, and towns. As pointed out by petitioner, the measure (§ V, entitled "Taxes") would destroy their power to tax (see art. XI, § 12) and would restrict their powers by regulating their budgets and limiting their expenditures (see art. XI, §§ 18, 20). Both city and county charters apparently would be abrogated in large measure, if not completely repealed, insofar as they relate to tax measures. (See § XII, subsec. (7), hereinafter quoted.)

10. Article XIII dealing with revenue and taxation appears to be in effect entirely repealed by section V of the measure, entitled "Taxes," and by section XII, subsection (7), providing for a blanket repeal of "any section, subsection, sentence, clause or phrase of the constitution" which "is in conflict with any of the provisions of this article."

11. Article XIV of our present Constitution, which has to do with water and water rights, is enlarged by section X of the measure, which also treats of waters.

12. Article XVI deals with state indebtedness. Its provisions are altered by the provisions of section III of the measure for the issuance of bonds to meet deficits in the pension fund and by the taxing and budgeting provisions of section V of the measure.

13. Article XVIII, having to do with amending and revising the Constitution, is altered by the provisions of sections III and XII of the measure, which provide for submitting amendments to the "article" at the pleasure of the pension commission and in whatever form or substance proposed by them.

14. Article XX of the Constitution deals with miscellaneous subjects. Section 22 thereof, which has to do with intox-

icating liquors, appears to be affected by certain provisions of section IV of the measure, which treat of the serving of liquor by gambling licensees.

15. Article XXIV of our present Constitution, which has to do with the state civil service system, would be altered by the exclusion from civil service of the assistants and employes of the pension commission and of the "Board of Naturopathic Examiners" proposed to be established under sections II and VII of the measure.

16. The provisions of article XXVI of the Constitution, which deal with motor vehicle taxation and revenues would appear to be repealed in their entirety by the provisions of the "TAXES" section (§ V) of the measure, coupled with the blanket repeal provisions of subsection (7) of section XII.

17. A new subject would be added by the provisions of the measure which concern oleomargarine.

18. A second new subject would be added by the provisions as to the "Board of Naturopathic Examiners" and its functions.

19. A third new constitutional subject (new excepting insofar as it relates to the Declaration of Rights in art. I) appears in the provisions establishing civic centers at public school buildings.

20. The provisions concerning surface mining, found in section XI of the measure, would add a fourth new subject to our Constitution.

21. The provisions of section XII of the measure, entitled "GENERAL," would add at least a fifth new subject—that of reimbursement of a "volunteer worker in a political campaign" for expenses incurred.

To recapitulate, at least 15 of the 25 articles contained in our present Constitution would be either repealed in their entirety or substantially altered by the measure, a minimum of four (five, if the civic center provision be deemed new) new topics would be treated, and the functions of both the legislative and the judicial branches of our state government would be substantially curtailed.

Our review of the subjects covered by the measure and of its effect on the totality of our plan of government as now constituted does not purport to be exhaustive. It is amply sufficient, however, to demonstrate the wide and diverse range of subject matters proposed to be voted upon, and the revisional effect which it would necessarily have on our basic

plan of government. The proposal is offered as a *single amendment* but it obviously is multifarious. It does not give the people an opportunity to express approval or disapproval severally as to each major change suggested; rather does it, apparently, have the purpose of aggregating for the measure the favorable votes from electors of many suasions who, wanting strongly enough any one or more propositions offered, might grasp at that which they want, tacitly accepting the remainder. Minorities favoring each proposition severally might, thus aggregated, adopt all. Such an appeal might well be proper in voting on a *revised* constitution, proposed under the safeguards provided for such a procedure, but it goes beyond the legitimate scope of a single amendatory article. There is in the measure itself no attempt to enumerate the various and many articles and sections of our present Constitution which would be affected, altered, replaced, or repealed. It purports only to *add* one new article but its framers found it necessary to include the omnibus provision (§ XII, subdiv. (7)) that "If any section, subsection, sentence, clause or phrase of the constitution is in conflict with any of the provisions of this article, such section, subsection, sentence, clause or phrase is to the extent of such conflict hereby repealed."

Intervenors concede that, "In an initiative which has as broad a purpose as the 'California Bill of Rights,' many sections of the present Constitution are bound to be affected in some measure," but they urge that "The inclusion of several apparently unrelated subjects in a proposed constitutional amendment does not require the use of the method of revision set forth in article XVIII, section 2, of the Constitution to the exclusion of the use of the initiative provisions of the Constitution." To support their argument intervenors rely upon *Wright* v. *Jordan* (1923), 192 Cal. 704, 711 [221 P. 915]; *Epperson* v. *Jordan* (1938), 12 Cal.2d 61, 68-69 [82 P.2d 445]; and *Brown* v. *Jordan* (1938), 12 Cal.2d 75, 77-78 [82 P.2d 450]. But those cases do not undertake to determine that a substantial constitutional revision may be accomplished through the medium of a single initiative amendment. They hold, merely, that the express requirement of section 1 of article XVIII of the Constitution that, in the case of constitutional amendments *proposed by the Legislature*, "Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished, by numbers or

otherwise, that each can be voted on separately,'' does not apply to amendments proposed under the initiative process. In none of those cases did the proposed initiative enactment effect such extensive alterations in the basic plan and substance of our present Constitution, or at all approximate in coverage the variety of additional subjects or separate fields of governmental activity, as the measure now before us would encompass; and in none of those cases was the effect of section 2 of article XVIII, dealing with revision of the Constitution, mentioned.

Intervenors concede also that ''When our Constitution was framed different procedures were provided for amendments and revisions, and therefore some distinction between the two must have been contemplated.'' Certainly it cannot be solemnly announced as a general rule of thumb that an initiative measure which would affect all the articles of the Constitution would constitute a revision thereof, whereas a measure which would affect all except one (or all, less two-fifths) of the articles would thereby be reduced to the status of an amendment. Yet that is, in substance, the position taken by the intervenors. They urge that if any less than all sections of the Constitution are altered, and if any less than all old sections are discarded, the change is merely an amendment. We cannot accept such an arbitrary and strained minimization of difference between *amend* and *revise*. The differentiation required is not merely between two words; more accurately it is between two procedures and between their respective fields of application. Each procedure, if we follow elementary principles of statutory construction, must be understood to have a substantial field of application, not to be (as argued in intervenors' Answering Memorandum) a mere alternative procedure in the same field. Each of the two words, then, must be understood to denote, respectively, not only a procedure but also a field of application appropriate to its procedure. The people of this state have spoken; they made it clear when they adopted article XVIII and made amendment relatively simple but provided the formidable bulwark of a constitutional convention as a protection against improvident or hasty (or any other) revision, that they understood that there was a real difference between amendment and revision. We find nothing whatsoever in the language of the initiative amendment of 1911 (art. IV, § 1) to effect a breaking down of that difference. On the contrary, the distinction appears to be

scrupulously preserved by the express declaration in the amendment (particularly in the light of the Livermore case as noted, *supra*) that the power to propose and vote on "amendments to the Constitution" is reserved directly to the people in initiative proceedings, while leaving unmentioned the power and the procedure relative to constitutional revision, which revisional power and procedure, it will be remembered, had already been specifically treated in section 2 of article XVIII. Intervenors' contention—that any change less than a total one is but amendatory—would reduce to the rubble of absurdity the bulwark so carefully erected and preserved. Each situation involving the question of amendment, as contrasted with revision, of the Constitution must, we think, be resolved upon its own facts. A case might, conceivably, be presented where the question would be close and where there would be occasion to undertake to define with nicety the line of demarcation; but we have no such case or occasion here.

The delegation of far reaching and mixed powers to the commission, largely, if not almost entirely in effect, unchecked, places such commission substantially beyond the system of checks and balances which heretofore has characterized our governmental plan. It will be remembered that the measure prescribes no qualifications for holding the office of commissioner, other than that the person "shall have been an elector of this state for two years next preceding his election"; he is, as of absolute right, eligible for re-election; the commission, itself, may fill vacancies for unexpired terms; it has unlimited powers to propose and submit "amendments" to the "article"; every sentence and clause of our Constitution in conflict with the article is to "the extent of such conflict" repealed; the commission is given practically uncontrolled power over the funds collected, including, apparently, the substantially absolute power to give "reimbursement or compensation for expenses incurred by" a "volunteer worker in a political campaign"; the commission is given power to issue subpenas and, apparently, to punish for contempt and subject persons "to the same penalties as if such disobedience or false swearing occurred in an action in the superior court." The governor, the Legislature, and the courts are made powerless to remove a commissioner for any cause, or directly "to interfere with the effectiveness or operation of this article," apparently as construed by the commissioners; or, without approval by a vote at a general election "subsequent

to 130 days after such decision or order shall become final,''
to enforce ''any decision or order'' of a court ''in any action
or proceeding in law or equity'' ''which adversely, or at all,
either affects this article or the administration thereof or affects
the submission, by the pension commission, of any proposed
amendment to this article.'' Thus, in litigation anywhere
within the vast sweep of the measure (from gamblers to min-
isters; from mines to civic centers; from fish to oleomargarine;
from state courts to city budgets; from liquor control to
senate reapportionment; from naturopaths to allopaths; from
proposing constitutional amendments to reimbursing political
campaign workers; and from taxes to pensions), our hereto-
fore zealously guarded principle of justice equally available
through the courts for poor and for rich, for weak and for
strong, and for all of every station alike, would be fettered,
if not discarded, and justice, in its final attainment, would
depend not alone on the justness of the cause, not as of right
on the verdict of a jury or on truth or law or equity, but on the
political sagacity and acumen, and the financial ability, of the
litigant to wage a successful political campaign in defense of
the judgment to which the court had found him entitled.

If the proponents of the measure, instead of relying on
the guise of an additional article and a blanket repeal of every
conflicting portion of the Constitution, had frankly recast the
instrument in every detail in which it would be affected by
the changes they seek—if they had recast it to accomplish
exactly the ends they avowedly seek, neither more nor less—
but to attain those ends by actually recasting all the affected
sections and separately declaring the actual new articles, so
that all the changes would fit in as integral parts of a coherent
and consistent whole, then the fact of revision might be more
obvious on the surface but it could be no more real in substance.
As suggested by counsel for petitioner, one need only com-
pare the changes wrought on the 1849 Constitution by the
admittedly revised Constitution of 1879, with the changes
sought to be impressed on the latter document by the pending
measure, to make it altogether certain not alone that the new
measure is revisory but also that the scope and depth and
character of its proposed revision are more extensive than in
the revision of 1879.

Applying the long established law to any tenable view
of the facts which have been related, it is overwhelmingly
certain that the measure now before us would constitute a

revision of the Constitution rather than an amendment or "such an addition or change within the lines of the original instrument as will effect an improvement or better carry out the purposes for which it was framed." (*Livermore* v. *Waite* (1894), *supra*, 102 Cal. 113, 118-119.) Indeed, as has been shown in some detail, the effect of adoption of the measure proposed, rather than to "within the lines of the original instrument" constitute "an improvement or better carry out the purpose for which it was framed," would be to substantially alter the purpose and to attain objectives clearly beyond the lines of the Constitution as now cast. Consequently, as is established by the Livermore case and by the other authorities cited hereinabove, such a revised Constitution, as a single measure, may be submitted to the electorate only after it has been "agreed upon" by a constitutional convention called pursuant to the provisions of section 2 of article XVIII of the present Constitution.

It is to be noted that intervenors, in their reply memorandum, urge that the initiative amendment (Cal. Const., art. IV, § 1) should in some way be construed to "give the people" the power to initiate directly a revision of, as well as amendments to, the Constitution. But intervenors actually do not seek to initiate the constitutional procedure for a revision (see art. XVIII, § 2) by proposing through the initiative a measure calling a constitutional convention; rather do they seek to by-pass the convention altogether, thus setting up a wholly new and constitutionally unauthorized procedure for revision. They argue that there may be "a frustration of the will of the people by the legislature" through its neglect to call an authorized constitutional convention. It should be obvious to intervenors that if a Legislature is not responsive to the will of the people, it lies in the power of the people to replace the members of that Legislature. But whatever may be the rights of intervenors here, or of other groups, to initiate proceedings looking toward the end of a constitutional revision through authorized procedure, we are satisfied that the basic method of revision prescribed by article XVIII—revision through a constitutional convention (however called) and a subsequent vote of the people on the proposed revised Constitution—does not purport to be dispensed with, alternatively or otherwise, by section 1 of article IV, reserving the power to propose, and prescribing generally, the procedure for bringing to a vote, "laws and amendments to the Constitution."

Because of our conclusion that the measure proposes a revision rather than an amendment of the Constitution it becomes unnecessary for us to either consider or decide the several other contentions advanced by the petitioner and argued by intervenors or respondent. The motion of intervenors to strike certain portions of the petition is directed at matters which, as previously indicated, do not affect the ground on which we reach our conclusion; the inclusion of such matters, therefore, does not prejudice intervenors. Neither the answer of the intervenors nor that of respondent raises any issue of fact material to our conclusion. Other contentions advanced by intervenors for the first time in their reply memorandum, insofar as they are not specifically discussed above, are without persuasive force in any application to either the facts or the law which controllingly impel the conclusion we have reached.

The motion to strike is denied and the demurrers are overruled. Let the peremptory writ issue as prayed for.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

