[S. F. No. 22567.   In Bank.   Sept. 18, 1967.]

EDWARD J. FARLEY et al., Petitioners, v. BASIL HEALEY, as Acting Registrar of Voters, et al., Respondents.

Garry, Dreyfus, McTernan & Brotsky, Benjamin Dreyfus and Allan Brotsky for Petitioner.

Marshall W. Krause, M. Lawrence Popofsky and Paul N. Halvonik as Amici Curiae on behalf of Petitioners.

Thomas M. O'Connor, City Attorney, and George E. Kruger, Deputy City Attorney, for Respondents.

TRAYNOR, C. J.—Petitioners have obtained the signatures of more than 21,000 electors of the City and County of San Francisco to a petition to place an initiative measure on the ballot urging an immediate ceasefire and American withdrawal from Vietnam. Seeking submission of the measure to the voters at the November 7, 1967, municipal election, petitioners tendered the signatures to the acting registrar of voters. On the advice of the city attorney, the acting registrar refused to determine the sufficiency of the signatures to qualify the measure for the ballot. Petitioners then sought a writ of mandate from the superior court. That court denied relief on August 31, 1967. On September 5, petitioners filed a petition for a writ of mandate in this court to compel the acting registrar of voters and the county clerk to determine the sufficiency of the signatures and to place the measure on the ballot.

Petitioners allege that relief must be granted by September 22, 1967, to permit the determination whether they have sufficient signatures to qualify the measure for the ballot. Accordingly, they contend that an appeal from the superior court's order is not an adequate remedy. Under these circumstances they may invoke this court's original jurisdiction to determine their right to submit the proposed initiative

to the electorate despite the pendency of the superior court action. (*Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-91 [207 P.2d 47].)[1]

It must be noted at the outset that the acting registrar of voters exceeded his authority in undertaking to determine whether the proposed initiative was within the power of the electorate to adopt. Under section 180 of the Charter of the City and County of San Francisco, his duty is limited to the ministerial function of ascertaining whether the procedural requirements for submitting an initiative measure have been met. It is not his function to determine whether a proposed initiative will be valid if enacted or whether a proposed declaration of policy is one to which the initiative may apply. These questions may involve difficult legal issues that only a court can determine. The right to propose initiative measures cannot properly be impeded by a decision of a ministerial officer, even if supported by the advice of the city attorney, that the subject is not appropriate for submission to the voters. Given compliance with the formal requirements for submitting an initiative, the registrar must place it on the ballot unless he is directed to do otherwise by a court on a compelling showing that a proper case has been established for interfering with the initiative power. (*McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787].) In *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558 [11 Cal.Rptr. 340], and *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947], such a showing was made, and the court therefore had no occasion to consider whether an election official on his own motion may refuse to submit an initiative measure to the electorate on the ground that it deals with a matter not subject to the initiative. Accordingly, neither case is contrary to our conclusion herein. (See *Peterson* v. *Lamb Rubber Co.* (1960) 54 Cal.2d 339, 343 [5 Cal.Rptr. 863, 353 P.2d 575]; *People* v. *Banks* (1959) 53 Cal.2d 370, 389 [1 Cal.Rptr. 669, 348 P.2d 102].)

Since respondents in the present case, however, have refused to proceed and seriously contend that the proposed measure should not be submitted to the voters, we deem it appropriate to determine whether the charter enables the electorate to adopt it.

---

[1]The parties have stipulated to waive issuance of an alternative writ or order to show cause and to submit the case without oral argument upon the petition and the memorandum of points and authorities in opposition.

The proposed measure is denominated a declaration of policy. It provides that "It is the policy of the people of the City and County of San Francisco that there be an immediate ceasefire and withdrawal of U.S. troops from Vietnam so that the Vietnamese people can settle their own problems."

Section 179 of the charter provides: "The registered voters shall have power to propose by petition, and to adopt or reject at the polls, any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact, or any legislative act which is within the power conferred upon any other board, commission or officer to adopt, or any amendment to the charter. . . .

"Any declaration of policy may be submitted to the electors in the manner provided for the submission of ordinances; and when approved by a majority of the qualified electors voting on said declaration, it shall thereupon be the duty of the board of supervisors to enact an ordinance or ordinances to carry such policies or principles into effect, subject to the referendum provisions of this charter."

■ This power of initiative must be liberally construed (*Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [270 P.2d 481]) to promote the democratic process. (*Mervynne* v. *Acker*, *supra*, 189 Cal.App.2d 558, 563.) ■ Despite this rule of construction and the broad language of the charter, respondents contend that initiative measures cannot be submitted to the electorate unless they concern municipal affairs on which the board of supervisors could enact binding legislation. Section 179, however, is not so limited. It reserves to the people the power to initiate "any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact. . . ." As representatives of local communities, boards of supervisors and city councils have traditionally made declarations of policy on matters of concern to the community whether or not they had power to effectuate such declarations by binding legislation. Indeed, one of the purposes of local government is to represent its citizens before the Congress, the Legislature, and administrative agencies in matters over which the local government has no power. Even in matters of foreign policy it is not uncommon for local legislative bodies to make their positions known. By their Resolution No. 341-67, approved June 2, 1967, for example, the San Francisco Board of Supervisors commended President Johnson "for his stand on the present Arab-Israeli crisis" and urged "that all necessary action be taken to insure freedom of navigation for all countries in the Gulf of

Aqaba." Pursuant to section 179 the people as well as their elected representatives may adopt such resolutions.

Respondents contend, however, that petitioners' measure is not a "resolution," but a "declaration of policy" governed by the second paragraph of section 179. They urge that only declarations of policy that can be put into effect by ordinances can be adopted by initiative.

The second paragraph of section 179 neither restricts the measures that may be submitted pursuant to the first paragraph nor limits the declarations of policy that it authorizes by its own force. It does not expressly restrict the type of declaration that may be submitted, but instead refers to "any" declaration. The fact that the board's duty "to carry . . . into effect" approved policies is inoperative when the policy is beyond the power of the board to effectuate, affords no basis for restricting the right to declare the policy. Only by construing the paragraph narrowly against the power of initiative could it be held that the voters may only declare policies that the supervisors could effectuate by ordinance.

Even under such a narrow construction, however, the proposed initiative is authorized, for the board of supervisors can enact ordinances carrying out the policy of the declaration to express the popular will. The board by ordinance can use the avenues of advocacy available to it to express that will. It can, for example, direct its legislative representative in Washington to make the people's position known, rename streets or buildings, or order the posting of the declaration in public buildings.

The charter contains a numerical requirement as a built-in safeguard against frivolous use of the initiative process. There is no other limitation that prevents petitioners from submitting their measure to a general vote.

Let a peremptory writ of mandate issue directing respondents to determine the sufficiency of the signatures to the petition and, if determined to be sufficient, to place the proposed initiative on the ballot for the municipal election of November 7, 1967. This decision is final forthwith.

Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

BURKE, J.—I dissent. The obligation imposed upon the judiciary of this country[1] is to interpret and apply the

---

[1] Confirmed by the required oath of office (Cal. Const., art. XX, § 3).

330

supreme law, or sovereign will of the people. Under this distinctive American doctrine, termed "our greatest single contribution to the cause of free government," the people confided to the courts the responsibility to keep the power of government, national, state and local, by whomsoever exerted within the orbit authoritatively prescribed. (1 McQuillin, Municipal Corporations (3d ed.) § 1.96, pp. 357-358.)

This court's failure to uphold the responsible city officials of the City and County of San Francisco in their refusal to permit the machinery of local municipal elections to be used to legislate[2] upon issues exclusively federal in nature is an abdication of that responsibility.[3]

The formulation of policy with respect to the war in Vietnam is placed by the federal Constitution within the exclusive jurisdiction of the federal government, in the Congress and the President of the United States. It is to the federal government and its responsible officials that the petitioners should address their plea.[4]

Chartered cities are created under the authority of article XI, section 8, of the California Constitution, which specifies in subdivision (j), that "It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to *municipal affairs,* subject only to the restrictions and limitations provided in their several charters and in respect to *other matters* they shall be subject to *general laws.*" (Italics added; see also § 6 of art. XI.)[5] The people of San Francisco have acknowledged this constitutional limitation upon municipal authority by provid-

---

[2]A declaration of policy is an exercise of legislative power. (*Simpson* v. *Hite* (1950) 36 Cal.2d 125, 130 [3] [222 P.2d 225]; *Kleiber* v. *City etc. of San Francisco* (1941) 18 Cal.2d 718, 722-723 [117 P.2d 657]; *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 614-617 [150 P. 977]; see also *Reagan* v. *City of Sausalito* (1962) 210 Cal. App.2d 618, 624 [4] [26 Cal.Rptr. 775].)

[3]We are informed that an initiative petition of similar import seeking to force the voters of the City of New York to take an official position against the war in Vietnam was denied filing by the city clerk upon advice of the municipal corporation counsel.

[4]The First Amendment to the United States Constitution guarantees to the people the right to petition the government.

[5]Section 6, in pertinent part: "Cities . . . hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, and cities . . . heretofore organized by authority of this Constitution may amend their charters . . . so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to *municipal affairs* . . . and in respect to *other matters* they shall be subject to and controlled by *general laws.*" (Italics added.)

ing in their charter (§ 2) that "The city and county may make and enforce all laws, ordinances and regulations necessary, convenient or incidental to the exercise of all rights and powers in *respect to its affairs. . . .*" (Italics added.)[6]

"Municipal affairs," as those words are used in the Constitution, "refer to the internal business affairs of a municipality." (*City of Walnut Creek* v. *Silveira* (1957) 47 Cal.2d 804, 811 [12] [306 P.2d 453]; *Fragley* v. *Phelan* (1899) 126 Cal. 383, 387, 388 [58 P. 923]; see also *West Coast Advertising Co.* v. *City & County of San Francisco* (1939) 14 Cal.2d 516, 521-524 [95 P.2d 138]; *City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718 [54 Cal.Rptr. 210].) Thus in discussing and clarifying the extent of the powers of chartered cities under the constitutional grant, the court in *West Coast* emphasized frequently and at length the "municipal affairs" and "municipal purposes" aspects and restrictions. (See also *Brougher* v. *Board of Public Works* (1928) 205 Cal. 426, 437 [2] [271 P. 487]; *Cralle* v. *City of Eureka* (1955) 136 Cal.App.2d 808, 811 [1] [289 P.2d 509].)

Concededly, the basic rule is that statutory or charter provisions dealing with the power of initiative and referendum are to be liberally construed in favor thereof. (*Gage* v. *Jordan* (1944) 23 Cal.2d 794, 799 [1] [147 P.2d 387]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [3] [270 P.2d 481]; *Hunt* v. *Mayor & Council of City of Riverside* (1948) 31 Cal.2d 619, 622-623 [1] [191 P.2d 426].) But no liberality of construction, however indulgent, can contravene the express constitutional restrictions limiting to municipal affairs the initiative legislation which may be adopted by a chartered city.

To focus our attention upon what is within the ambit of "municipal affairs," McQuillin points out that "Modern city government controls the things that touch the home and life of the citizen, such as law and order, protection of life, limb and property, safety on the streets and everywhere within the corporate limits; protection from lawlessness, from traffic danger, from fires; safeguard of health by necessary sanitation, pure water, food supplies, light, air, hospitals and scientific devices; and promoting morality. The way by which these

[6]We find a further recognition of this limitation in the very paragraphs of the charter upon which petitioners here rely. Section 179 expressly limits the use of the initiative and referendum to acts which are "within the power conferred upon the board of supervisors to enact" or within the legislative power of any other board or officer.

matters are originated and controlled is by the voters working and cooperating together and with their public servants, and speaking with judgment at the polls by their vote in choosing officers and passing on measures.'' (1 McQuillin, Municipal Corporations (3d ed.) § 1.113, p. 413.)

Our courts have not hesitated to compel or to approve omission from the ballot of measures plainly beyond the intent of the people when they spoke in framing and adopting the constitutional enactments reserving to themselves the power of initiative and referendum. (See *Simpson* v. *Hite, supra* (1950) 36 Cal.2d 125, 133-134, and cases there cited; *McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 334 [4], 357 [196 P.2d 781]; *Hunt* v. *Mayor & Council of City of Riverside, supra* (1948) 31 Cal.2d 619, 628-629 [5]; *Gage* v. *Jordan, supra* (1944) 23 Cal.2d 794, 799-800 [1-4], 804-807 [9]; *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 565 [9b] [11 Cal.Rptr. 340].) Thus in *Simpson,* the principle was again emphasized by a unanimous court that the people never intended that the initiative or referendum apply where ''the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power, . . .'' (P. 134 [6] of 36 Cal.2d; see also *Alexander* v. *Mitchell* (1953) 119 Cal.App.2d 816, 823-825 [7, 8], 828 [14] [260 P.2d 261].)

It is contended that by the use in charter section 179 of the phrase ''declaration of policy'' the people intended to reserve to themselves a unique straw vote or poll-taking device not common to other charters which somehow escapes the limitations of the state Constitution. Assuming such was the purpose of the framers of the charter, it would be to no avail because the limitations of the Constitution must control. The Constitution is the measure of the power.[7]

History shows that because of frequent disputes over the basic policy involved in local legislative matters, governing boards have upon occasion utilized the referendum to ascertain the will of the electorate upon the major policy decisions involved. Once such decisions have been settled by popular vote then the board has proceeded to implement such policy by the enactment of whatever ordinances are necessary. (See *Hopping* v. *Council of City of Richmond, supra* (1915) 170 Cal. 605, 614-617.) It was to take advantage of this method of ascertaining and carrying out the will of the people that the framers of the San Francisco Charter adopted the provision in

---

[7]*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 565; article XI, section 8, subdivision (j); article IX, section 1.

question. This purpose is clearly indicated by the express provisions making it the duty of the board to enact the ordinances necessary to effectuate such policy decisions of the people. If, as petitioners contend, these policy determining procedures are not limited to municipal affairs then the language imposing the duty upon the board of supervisors to adopt the ordinances required to carry such policy into effect is rendered meaningless. Such an interpretation is violative of the fundamental rules of statutory construction.

Petitioners seek to avoid this pitfall by suggesting that if the electorate adopts their proposed policy on the Vietnam war the board of supervisors could implement such policy by enacting ordinances, e.g.: to direct its legislative representative in Washington to make the people's position known; to rename the War Memorial Opera House as the Immediate Cease Fire Building; or to order the posting of the declaration in public buildings. These suggestions demonstrate that petitioners were hard put to think of a single *legislative* act the board of supervisors could enact to effectuate the policy.[8] None of the suggested "ordinances" would qualify as anything more than administrative in nature. Hardly could they be accorded the dignity of local *legislation*. To urge that such method of propagandizing or of denigrating a point of view would lend legality to the basic legislative objective is to demonstrate that the policy declaration sought cannot qualify as a "municipal affair."

But, note the majority in today's opinion, boards of supervisors and city councils adopt resolutions on matters of national concern, so why not the electorate of their cities?

Boards of supervisors and city councilmen are not "representatives of local communities" on matters outside the scope of county and municipal affairs and certainly are not authorized in any *representative capacity* to express the will of the people on matters of national policy. Congressmen are elected to perform this function. Under the separation of powers provided for by our state and federal Constitutions officials elected to represent cities, towns and counties in local affairs have no power whatever to commit or bind their local citizenry on non-municipal affairs. But, asserts the majority opinion, "representatives of local communities" such as boards of supervisors and city councils, have traditionally so

---

[8]Section 13 of the charter requires that "every legislative act shall be by ordinance."

acted in making "declarations of policy on matters of concern to the community whether or not they had power to effectuate such declarations by binding legislation."[9]

Admittedly, in the enjoyment of the much cherished and exercised American privilege of speaking out without restraint, the minute books of such boards are replete with recorded resolutions on every conceivable subject, but when such actions transcend the constitutional powers of such a board their pronouncements have no *legal* significance whatever.

When the members of such a board act in this manner on national issues they speak for themselves alone. Not one whit of "representative capacity" is added by any number of repetitions of such ultra vires acts. They remain the expressions of the individuals involved. Such expressions of sentiment are no more binding upon the people of the community or upon the corporate entity itself than are the utterances of any group in the town square. Why then are they allowed to pass such resolutions, we might ask? Acceptance of public office does not cut off a person's right of free speech. And although from time to time someone may question the use of public funds and facilitities to record the individual opinions of supervisors on matters outside the scope of their duties and responsibilities, the cost to the local treasury of the adoption of such resolutions is minimal. The opinion of the city attorney is not asked and understandably is not volunteered on the legality of expenditures for such purposes; and the "resolutions" make good news copy; hence, they continue unabated. This court should not permit the past indulgence of boards in such practices to be used as a justification for petitioners to force the taxpayers of a city to finance the taking of a public poll on a non-municipal subject.

We should face this problem squarely, as did the acting registrar and the city attorney in this case. The use of the election machinery of the city for any purpose involves a substantial expenditure of public moneys. If petitioners can force the use of the ballot at the forthcoming regular municipal election for this purpose, the next occasion could well require the calling of a special municipal election to vote on

---

[9]Petitioners set forth a number of such "ordinances." However, an examination of each demonstrates that not a single one was in fact an ordinance. Each was a "resolution" of the board of the type discussed here.

such a measure,[10] involving very substantial expenses. In dealing with measures calling for the expenditure of public moneys we must be mindful of their nature. Moneys raised through the power of taxation are impressed with a public trust to be used for lawful purposes. They are extracted from rich and poor alike and often painfully from those scarcely able to pay but doing so under the penalty of loss of property through tax sale.

We must also weigh the effect of today's decision upon other counties and cities, all of which enjoy the use of the initiative and referendum either by state statute or local charter. The widespread abuse of the initiative as a poll-taking device on non-municipal issues could cause the people, in recoiling from the resulting expense, to drastically curtail its use. Unabated, such abuse could destroy the concept of *local* government as we have known it and as the framers of our state and federal Constitutions conceived it.

There are in every community militant groups espousing controversial causes of all kinds. History has demonstrated that signatures to petitions can be obtained for almost any conceivable purpose. It takes little imagination to name issues which one or another group might desire to force to a municipal vote:

That capital punishment be abolished;
That a state or federal officer be impeached;
That civil rights marches be declared unconstitutional and participants jailed;
That private school systems be abolished;
That abortion laws be abrogated;
That schools be segregated;
That state universities be tuition free;
That this country should (or should not) bomb ——;
That vivisection be a federal offense;
That the CIA be banned;
That the borders of the state be closed to persons of (whatever category);
That this country wage war on ——;
That daylight saving be abolished;
That Congress ban fluoridation;
That marijuana be legalized.
Not one of these issues is any further removed from munici-

---

[10]Section 182 of the charter.

pal affairs than the agonizing problem which is the concern of the present petition. And what would be the ultimate effect of such broadening of municipal elections? Apart from the illegality of such action, the injection of issues such as these in municipal elections would so embroil the people of any community that worthy candidates for local office, seeking election based upon their individual records of experience and their platforms for municipal improvements, and perplexing local issues requiring close public scrutiny and attention, would be utterly lost in the confusion caused by the intrusion of such highly volatile, non-municipal issues. The quality of local government would greatly deteriorate in direct ratio to this diversion from local problems. And who is to say that this country can afford the slightest inattention to the awesome issues which confront and even threaten to destroy the American city of today?

It is one thing to elect a state legislator, a Congressman, or a President on the basis of his stand on state or national issues, but it is quite another to judge the personal qualifications of a mayor, district attorney, assessor or supervisor because of his personal views on ballot propositions not related to local government.

Petitioners contend and the majority opinion declares that the acting registrar exceeded his authority in undertaking to determine whether the proposed initiative was within the power of the electorate to adopt. These charges demonstrably are without merit. Section 180 of the San Francisco Charter is devoid of the limitations which the majority declare to be found in the section.[11] Instead, it specifies, *inter alia,* that

---

[11]Charter section 180, in full:

"The filing, verification and certification of initiative, referendum and recall petitions shall be in accordance with general law, and rules and regulations of the registrar of voters relative to details not covered by general law, except as otherwise provided by this charter. Any signer to a petition may withdraw his name from the same by filing with the registrar of voters a verified revocation of his signature before the filing of the petition. No signature can be revoked after the petition has been filed. Unless and until it be proven otherwise by official investigation by the registrar, it shall be presumed that the petition filed conforms to all legal requirements and contains the signatures of the requisite number of registered voters, and after an election based thereon, the sufficiency of such petition shall not be questioned.

"If any signature be questioned, the registrar shall mail notice to such purported signer, stating that his or her name is attached to such petition and citing him or her to appear before said registrar forthwith, naming the time and place. Said citation shall enclose a blank affidavit, which may be used to deny that the affiant signed such petition. If such person does not desire to attend in person, he may swear to such affidavit

*"Unless and until it be proven otherwise by official investigation by the registrar,* it shall be presumed that the petition filed *conforms to all legal requirements* and contains" sufficient qualified signatures. (Italics added.)

Moreover, section 173 of the charter in its first sentence tells the registrar that "The conduct, management and *control of . . . the holding of elections, and of all matters pertaining to elections* in the city and county shall be *vested exclusively"* in him. (Italics added.) Section 26 of the charter instructs the city attorney to "give his advice or opinion in writing to any officer, board or commission of the city and county when requested." The city attorney advised that the declaration set forth in the proposed initiative measure may not properly be placed on the ballot and that the registrar should refuse to accept the petitions for filing in his office. Accordingly, the registrar did so refuse.

That this is the accepted, customary and approved procedure by which responsible public officials attempt to determine and to carry out their duties in the premises is demonstrated repeatedly by decisions of the appellate courts of this state.[12] In *Riedman* v. *Brison* (1933) 217 Cal. 383 [18 P.2d 947], now dismissed by the majority as having "had no

of denial before any officer authorized to take oaths, and mail the same to the registrar. If he does not so attend and deny such signature in person or by making and mailing such affidavit of denial before the time when the registrar must, under general law, make final determination, the signature to such petition must be treated as genuine. The registrar shall keep a list of the names of all purported signers who appear before him and deny their signatures under oath, and also file and keep such affidavits for at least one year.''

[12]With respect to proposed initiative or referendum measures, see the following: *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 555 [219 P.2d 457], in which this court issued *prohibition to halt* mandamus proceedings by which it was sought to compel the city clerk of Los Angeles to file a referendum petition; *Myers* v. *Stringham* (1925) 195 Cal. 672, 673 [235 P. 448]; *Dwyer* v. *City Council* (1927) 200 Cal. 505, 508-509 [253 P. 932]; *Mervynne* v. *Acker, supra* (1961) 189 Cal. App.2d 558, 560, 562 [6]; *Alexander* v. *Mitchell, supra* (1953) 119 Cal. App.2d 816, 818, 829 [16]; *Hyde* v. *Wilde* (1921) 51 Cal.App. 82, 85-86 [2] [196 P. 118]; *Chase* v. *Kalber* (1915) 28 Cal.App. 561, 564 [153 P. 397]; *Bennett* v. *Drullard* (1915) 27 Cal.App. 180, 187 [149 P. 368]; see also *Hunt* v. *Mayor & Council of City of Riverside, supra* (1948) 31 Cal.2d 619, 621.

With respect to proposed municipal bond issues, see e.g. *City of Walnut Creek* v. *Silveira, supra* (1957) 47 Cal.2d 804, 807, and *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 731 [1] [290 P.2d 859], in both of which, as in the present case, the duties of the local official were ministerial and to be compelled by mandamus *"if the proposed issue meets the requirements of the law,"* (found in Constitution and statutes) as to the purposes for which the bonds may issue and the revenue sources available to pay them. (Italics added.)

occasion to consider'' the matter, this court in denying mandamus to *compel* a city *clerk to examine and certify* an *initiative petition,* declared at the outset (p. 386 [1]) that ''the question is one of law relating to the *jurisdiction of the city clerk* to *act at all* in this matter,'' and ruled (pp. 387-388 [3]) that ''The matter to which the *petition in* the *hands of* the *city clerk* relates, *not being a matter of municipal legislation, that official* has *no legal duty to perform in relation to it* under the charter.'' (Italics added.) *McFadden* v. *Jordan, supra* (1948) 32 Cal.2d 330, 332, cited by the majority in support of their attack on the registrar, not only does not discuss, much less support, the proposition for which it is advanced, but instead briefly states that ''Mandamus is a proper remedy'' to compel *omission* of a proposed initiative measure from the ballot. These citations fully support the responsible city officials in their actions here.

In conclusion, there is an understandable reluctance on the part of judges to take any step which on its face may appear to thwart the will of the electorate. It is especially so where, as here, to act would frustrate the desires of an alleged 21,000 signers of the proposed initiative petition. In considering the will of the electorate, however, we must recall that it was the voters of the entire state who limited the legislative powers of supervisors and of the local electorate. Consequently, in holding this attempted legislative act invalid the court would be declaring the sovereign will of the people of the state as a whole. (1 McQuillin, Municipal Corporations (3d ed.) § 1.96, p. 354.) Authorities in municipal government have listed as one of the major defects of such governments in this country the failure to separate national and state politics from local issues in municipal elections and administration. (1 McQuillin, *op. cit. supra,* § 1.114, p. 416.) The decision of this court today opens the door to compounding this defect a thousandfold.

The writ sought should be denied.

McComb, J., concurred.